OPINION OF THE COURT
Gerard E. Delaney, J.
The issue of first impression before this court is whether there exists a "parent-child” privilege which would prevent forced disclosure by the State of confidential communications between a parent and a child of any age when the parties to such communication mutually assert such a privilege.
In the opinion of this court, such a privilege can and does exist, grounded in law, logic, morality and ethics.
This case came for trial before this court on October 29, 1979, following its remittal by the Court of Appeals on November 30, 1978 (People v Fitzgerald, 45 NY2d 574) which had reversed the decision of the Appellate Division, Second Department (62 AD2d 885) and reinstated counts one and two of the indictment, which charged defendant with the crimes, inter alia, of criminally negligent homicide (Penal Law, § 125.10) and assault in the third degree (Penal Law, § 120.00, subd 3), which counts had been dismissed on April 27, 1976 by the Westchester County Court (Couzens, J.) on a motion to dismiss pursuant to CPL 200.50 (subd 7). The remaining two counts of the indictment charge defendant with leaving the scene of an accident without reporting (Vehicle and Traffic Law, § 600).
A. FACTS
On December 22, 1975 in the Village of Briarcliff Manor, New York, two teen-age women, Cara Pollini and Susan Bassett, were walking to the side of, but in, the northbound traffic lane of Pleasantville Road. There was snow in the road and plowed alongside, the result of earlier precipitation that day. At approximately 10:00 p.m. they were both struck by a vehicle, which resulted in the death of Cara Pollini and personal injury to Ms. Bassett. The operator of the vehicle did not stop, render aid or otherwise identify himself at the scene. Following police investigation, the defendant, Michael Fitzgerald, was charged with the above-mentioned crimes.
*714 Prior to defendant’s trial it became apparent to all parties that the People had subpoenaed as their own witness, James Fitzgerald, the father of 23-year-old Michael Fitzgerald, and would seek to elicit from him certain admissions made by his son. Michael and his father, James, had spoken while alone together on Christmas Eve, December 24, 1975, concerning the accident in question. On January 23, 1976 his father testified concerning these conversations while under subpoena by the People during the Grand Jury presentment of this matter (there is no issue of secrecy concerning the father’s Grand Jury testimony; the transcribed minutes of such testimony were made an open exhibit on the earlier appeal in this matter).
Counsel for the father, James, brought on by order to show cause, a motion to preclude the compelled testimony of James Fitzgerald concerning his confidential communications of December 24, 1975 with his son, Michael, on the grounds that such conversation was subject to a "parent-child privilege.” The defendant, Michael Fitzgerald, joined in this application. The People oppose such motion claiming no such privilege exists and if it does, James Fitzgerald has waived it by testifying before the Grand Jury, and by producing the testimony in a motion open to the public.
B. DOES A "PARENT-CHILD PRIVILEGE” EXIST?
A "[privilege [is] in essence [a] rule of exclusion, but, while most exclusionary rules tend to guard against the admission of evidence of low probative force * * * privileges are designed to protect relationships deemed socially desirable * * * the social benefit to be derived from the protected relationship is believed to outweigh the harm that results from exclusion”, that is, a "balancing between conflicting social values. In most cases the conflict occurs between the desire to maintain a certain relationship and the need for just resolution of legal controversies” (Fisch, New York Evidence [2d ed], §511, p 335).
No statutory "parent-child” privilege exists in New York State, though the Legislature has codified the early common-law privileges of "attorney-client” (CPLR 4503), "husband-wife” (marital privilege — CPLR 4502), and that of "self-incrimination” (CPLR 4501; cf. US Const, 5th Arndt; NY Const, art I, § 6; CPL 50.20). Additional privileges not found in the common law, but enacted by New York State, include the following: *715 "physician/dentist/nurse-patient” (CPLR 4504), "clergy-penitent” (CPLR 4505), "psychologist-patient” (CPLR 4507), "social worker-client” (CPLR 4508), the qualified privilege granted to newspersons and journalists (Civil Rights Law, § 79-h) and many State statutes deeming information in the possession of public officials as privileged from disclosure in varying degrees (see Fisch, New York Evidence [2d ed], § 744, at p 440).
Contrary to the varied expansions of the concept of privilege exemplified above, "[t]he tendency is not to extend the classes to whom the privilege from disclosure is granted, but to restrict that privilege.” (People ex rel. Mooney v Sheriff of N. Y. County, 269 NY 291, 295.) However, the courts cannot shield themselves behind such a "tendency” and disregard all such situations where the foundations of certain basic relationships, such as those between family members may be threatened.
Indeed, it has been stated that: "[although the communication [between parent and child] is not protected by a statutory privilege, we do not conclude that it may not be shielded from disclosure. It would be difficult to think of a situation which more strikingly embodies the intimate and confidential relationship which exists among family members than that in which a troubled young person, perhaps beset with remorse and guilt, turns for counsel and guidance to his mother and father. There is nothing more natural, more consistent with our concept of the parental role, than that a child may rely on his parents for help and advice. Shall it be said to those parents, 'Listen to your son at the risk of being compelled to testify about his confidences?’ ” (Matter of A. & M., 61 AD2d 426, 429; emphasis added; cf. Matter of Mark G., 65 AD2d 917; Matter of Michelet P., 70 AD2d 68.)
In circumstances wherein the obligation of parents towards their children may be uncertain it is clear that our courts recognize that parents have not only the right but the obligation to provide moral supervision and guidance for their children. (Matter of Anonymous, 37 Misc 2d 411.) "Neglect of children does not mean a failure to provide children with the necessaries of life. It means infinitely more than that. A failure to provide children with spiritual guidance, with the inculcation of a moral sense, or conduct such by parents as would cause children because of a rejection to engage in delinquent conduct, is neglect.” (Matter of O’Donnell, 61 NYS2d 822, 824; cf. Family Ct Act, § 1012, subd [f].)
*716 It is further "now established that our Constitution protects the sanctity of the family,” (Matter of Michelet P., 70 AD2d 68, 75) "precisely because the institution of the family is deeply rooted in this Nation’s history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural.” (Moore v East Cleveland, 431 US 494, 503-504.) Such rights may well be viewed as "so rooted in the traditions and conscience of our people as to be ranked as fundamental” (Snyder v Massachusetts, 291 US 97, 105; cf. Griswold v Connecticut, 381 US 479), and are "clearly entitled to constitutional protection.” (Matter of A. & M., supra, at p 432.)
It is said that there are certain "private realm[s] of family life which the state cannot enter.” (Prince v Massachusetts, 321 US 158, 166.) Confidential communications, by their very nature, in order to foster the ongoing confidential parent-child communications between parent and child, must remain confidential and private if the parties so desire, and be without the power of the State to inquire: "[T]here can be no doubt what the effect on [the parent-child] relationship would be if the State could compel parents to disclose information given to them in the context of [a] confidential setting. Surely the thought of the State forcing a mother and father to reveal their child’s alleged misdeeds, as confessed to them in private, to provide the basis for criminal charges is shocking to our sense of decency, fairness and propriety. It is inconsistent with the way of life we cherish and guard so carefully and raises the specter of a regime which encourages betrayal of one’s offspring. And if, as seems likely, the parents refuse to divulge their child’s confidences, the alternatives faced by the parents, i.e., risk of prosecution for contempt or commission of perjury, could seriously undermine public trust in our system of justice.” (Matter of A. & M., supra, at p 433; emphasis added.)
Given such imperative social considerations which ought to be fostered by the State for the benefit of the integrity of the parent-child relationship and being of the opinion that "the injury that would inure to the relation by the disclosure of the communications [is] greater than the benefit” to be derived by the State in its disposal of litigation (8 Wigmore, Evidence [McNaughton rev], §2285) this court holds that a parent-child privilege does exist in this State, flowing directly from such rights as are granted by both the Federal and New York State Constitutions (US Const, 9th and 14th Arndts; NY Const, art I, *717 §§ 1, 6) which have fostered the recognition of what has come to be known as the "right to privacy.” (Accord Matter of A. & M., 61 AD2d 426, supra; Matter of Michelet P., supra, at pp 75, 76; see, generally, Warren and Brandéis, The Right to Privacy, 4 Harv L Rev 193; Griswold v Connecticut, 381 US 479, supra; Comment, Privacy after Griswold: Constitutional or Natural Right, 60 Nw U L Rev 813; Kauper, Penumbras, Peripheries, Emanations, Things Fundamental and Things Forgotten: The Griswold Case, 64 Mich L Rev 235; see cases cited in Matter of A. & M., supra, at pp 430-434.)
New York State, by statute, recognizes the concept of a "right to privacy” in certain instances. (See Civil Rights Law, §§ 50-52; CPLR 215, subd 3; Penal Law, art 250, Oifenses Against the Right to Privacy; cf. Executive Law, § 830.) While such a right to privacy was not recognized at common law in New York State (cf. Schumann v Loew’s, Inc., 135 NYS2d 361; Association for Preservation of Freedom of Choice v Emergency Civ. Liberties Committee, 37 Misc 2d 599) in light of Griswold (supra) there is no longer room for doubt but that such a right is one of Federal constitutional dimensions and may not be abridged by the State. (US Const, 14th Arndt.)
In Matter of A. & M. (supra, at p 435) it was held that "communications made by a minor child to his parents within the context of the family relationship may, under some circumstances, lie within the 'private realm of family life which the state cannot enter’ ” (quoting Prince v Massachusetts, 321 US 158, 166, supra; emphasis added). Such a result would occur "if it is determined that the information sought * * * was divulged by the [child] in the context of the familial setting for the purpose of obtaining support, advice or guidance * * * [then] the interest of society in protecting and nurturing the parent-child relationship is of such overwhelming significance that the State’s interest in fact-finding must give way.” (Matter of A. & M., supra, at pp 433-434; cf. Perry v Fiumano, 61 AD2d 512, 516.)
While the appellate court in Matter of A. & M. (supra, pp 434-435) was of the opinion that "the creation of a [parent-child] privilege devolves exclusively on the Legislature”, since such a privilege flows directly from Federally protected constitutional rights of privacy, it is a question of law which is appropriate for this court’s decision, notwithstanding the lack of legislative recognition of such a fundamental right to date.
*718 C. DOES THE PARENT-CHILD PRIVILEGE EXIST ONLY WHERE THE CHILD IS A MINOR?
Much of the dicta by the court in Matter of A. & M. (61 AD2d, at p 432) dealt with the recognition of the social and psychological implications inherent in the "role of the family, particularly that of the mother and father, in establishing a child’s emotional stability, character and self-image.” The privacy of the confidential communications between parent and child was deemed "critical to a child’s emotional development that he know that he may explore his problems in an atmosphere of trust and understanding without fear that his confidences will later be revealed to others.”
Michael Fitzgerald was 23 years old when he went to his father in confidence for advice on December 24, 1975. As he was 18 years of age or older he concededly was no longer a "minor” under our laws. (US Const, 26th Arndt; cf. CPLR 105, subd [j], no longer an "infant”.) The People argue, inter alia, that assuming arguendo a parent-child privilege does exist, and given defendant’s age of 23, that "[a]ny claim of a parent-child privilege under these facts is patently absurd”.
Evidence taken during a court directed hearing on the issue of privilege revealed, that while Michael Fitzgerald and his father both still resided in the Village of Briarcliff Manor at the time, they had separate residences; at the age of 19, Michael had gone away to college for six months, had returned to the village to become a police officer briefly and had then become a New York City fireman for a short while. After being laid off he then returned to the village and was working at the local post office and liquor store. Michael had not actually lived in his father’s house since he was approximately 21 years of age. However, James Fitzgerald saw Michael "frequently”, giving him the "normal father-son encouragement.”
While it is true that the "fostering of a confidential parent-child relationship is necessary to the child’s development of a positive system of values,” (Matter of A. & M., supra, at p 433) it does not follow that this fundamental relationship can arbitrarily be said by the State to cease at the stroke of midnight on the last day of the child’s 17th year.
The parent-child relationship of mutual trust, respect and confidence, if it exists at all in the individual case, is one that should be and must be fostered throughout the life of the *719 parties. Indeed, in many cases the closeness of the family unit may well increase as the child becomes an adult and realizes that the advice, encouragement and training by the parents had value and merit then and equal substance in later years. While the "minor” of 17 years and the parent of 40 may often be in disagreement on the values and lessons of life, the "adult” of 27 and the parent of 50 may well have enjoyed a resurgence of common values, ideals and mutual trust and respect, one for the other.
That such a relationship can indeed exist past the child’s age of majority does not seem "absurd” to this court. It is that very relationship, coupled with the confidential communication between the parties that such a parent-child "privilege”, arising out of the right to privacy, can be said to protect. The mutual trust and understanding, if such exists, between the parent and child cannot be made subject to the intrusion of the State merely because of a proposed artificial barrier of age..
How would the State propose its desired age limit to exist? Certainly for convenience of interpretation the physical age of the child should govern, i.e., "this privilege may not be asserted by a person 18 years of age or older.” It cannot be gainsaid, however, that "children” mature emotionally at different rates, and their reliance upon family guidance varies. If it would be understood by the State that it is the relationship of common bond and emotional need which should govern, then perhaps the privilege would read: "This privilege may not be asserted by a person who is physically and emotionally over the age of 18 years.” Then perhaps the realization occurs that children may vary in basic intelligence, assuming such may be accurately measured, and consideration need be given to these children of less than "normal” intelligence as would have need of greater parental influence and advice; then the standard may become "this privilege may not be asserted by a person who is physically and emotionally over the age of 18 years and who has an I.Q. over 110, and who does not reside with his parents, etc., etc., etc., ad absurdum. ”
Not only do logical, ethical and moral considerations mandate the extension of such a fundamental right beyond any arbitrary age, but if, as this court believes, such a parent-child "privilege” flows from the constitutional right to privacy inherent in such a relationship, the State is forbidden under *720 law to create such an artificial barrier as age to limit that right to certain persons only, due to the ongoing nature of such a relationship. (US Const, 14th Arndt; NY Const, art I, §§ 1, 11.) No other previously recognized privilege has as its basis a necessity of meeting a minimum or maximum age. It is the nature of the relationship and the nature of the communication which govern.
Therefore, this court concludes that such a parent-child privilege as arising out of a constitutional right to privacy may not and should not be limited by the age of either party asserting such claim.
D. WAIVER OF THE PRIVILEGE
Granting the existence of such a parent-child privilege, there are assuredly cases in which it may be waived or is inapplicable. The People claim such privilege was waived by the father James Fitzgerald; first, by his appearance before the Westchester County Grand Jury on January 23, 1976 in which, under questioning by an Assistant District Attorney, he disclosed the substance of his communications with his son, without objection; second, the complete transcript of James Fitzgerald’s testimony before the Grand Jury was utilized as an open exhibit attached to his order to show cause, dated October 29, 1979, which raised the issue of parent-child privilege before this court, and which then became part of the official County Court file on this matter, open to public inspection.
The appellate court in Matter of A. & M. (61 AD2d 426, 429, supra) concluded that communications between the parent and child did not fall within the protection of the marital privilege (CPLR 4502, subd [b]) of confidential communications. However, as stated above, the rationale for the existence of a parent-child privilege is most closely analogous to the marital privilege which is "[djesigned to protect and strengthen the marital bond, [so that it] encompasses only those statements that are 'confidential,’ that are induced by the marital relation and prompted by the affection, confidence and loyalty engendered by such relationship” (Poppe v Poppe, 3 NY2d 312, 315).
Both parties to a marital privilege must consent to divulgence of confidential communications between them. (CPLR 4502, subd [b]; People v Wood, 126 NY 249, 271; Parkhurst v Berdell, 110 NY 386, 393; cf. Poppe v Poppe, supra, at pp 314, *721 315.) Such a mutuality of privilege must exist in a parent-child situation, as well (Matter of A. & M., 61 AD2d, at p 435, n 9) as by its nature, the family relationship forms a common bond wherein the interests of the parties are similar, i.e., maintenance of the sanctity of the family, and injury by the State to one party of such familial unit effectually acts against all.
A parent-child privilege may be waivable, however. (Cf. People v Wood, supra; Parkhurst v Berdell, supra; Poppe v Poppe, supra.) Indeed, the court in Matter of A. & M. (supra, p 435, n 9) expressed concern with the spectre of a child in Family Court proceedings invoking "such a privilege to prevent his parents from testifying about matters in which they were seeking the intervention and assistance of the court in controlling the child’s behavior”, i.e., those provisions concerning the determination as to whether a person is "in need of supervision” (P.I.N.S.) (Family Ct Act, art 7). It is possible in such a proceeding a parent would wish to divulge to the court certain confidential communications made by the child in order to gain the help of the court in gaining or regaining supervisory control over a child. In such a situation the position of the State is one of attempting to maintain and foster the family relationship rather than simply invade it for its own purpose, and no rational purpose would apply to allow the child to claim the protection of a parent-child privilege in such case. This concept is recognized by analogy to those situations in which the interest of the State has been found to be paramount in invading the prerogatives of parental guidance "in the best interests of the child,” i.e., child protection proceedings under article 10 of the Family Court Act. The interest of the child in such instances is viewed as so worthy of State intervention that by statute the marital privilege and those of physician-patient, and social worker-client do not apply. (Family Ct Act, § 1046, subd [a], par [vii]; cf. Social Services Law, § 411 et seq.) The interests of the State have been "balanced against the rights of individual privacy, guaranteed by the Constitution,” (cf. Matter of A. & M., supra, at p 433) and the former found of greater benefit. It is likely that the same is true for the P.I.N.S. situation and the privilege must fall in such cases and be deemed by law or statute inapplicable.
When James Fitzgerald was subpoenaed by the People before the Grand Jury it can hardly be said that he was *722 appearing and testifying "voluntarily.” (See, generally, CPL 610.10, subd 2; 610.20, subd 2; Penal Law, §§ 215.51, 215.50, subd 4.) James Fitzgerald was granted automatic "transactional” immunity (CPL 190.40). "Testimony given in response to a grant of legislative immunity is the essence of coerced testimony” (New Jersey v Portash, 440 US 450, 459; emphasis added). Mr. Fitzgerald appeared before the Grand Jury and was initially told by the prosecutor that the Grand Jury was investigating the December 22, 1975 accident, shown photographs of his vehicle and told that "there has been evidence tending to show that was the vehicle that was involved in the accident.” James Fitzgerald had not been advised prior to his entry into the Grand Jury room that his son was a target of the investigation, and while his son had counsel, the father appeared without an attorney of his own. It should also be noted that his appearance took place two years before the appellate court in Matter of A. & M. (61 AD2d 426, supra) recognized that a concept of a parent-child privilege may well have a legal basis. It is difficult to conceive of a waiver of a privilege which may not have been considered at the time. "[A] waiver of a constitutional right must be competent, intelligent and voluntary”. (People v Hobson, 39 NY2d 479, 484.) This court finds under the unique circumstances of this case that such testimony by James Fitzgerald before such a quasi-judicial body as the Grand Jury did not operate as a waiver, to the degree necessary to find such, of the parent-child privilege as arises out of a Federal and State constitutional right to privacy.
Perhaps such issue may well be moot, as the People concede that such a privilege as envisioned by Matter of A. & M. (supra) is a "joint privilege shared by all family members.” Therefore, even if it could be deemed that James Fitzgerald waived his own privilege before the Grand Jury, such should have no effect, if as here, at trial, the defendant son, Michael, seeks to assert his own independent right of privilege. The same is true on the issue of whether the father waived his privilege by including the Grand Jury transcript as an open exhibit in the instant motion. The son, Michael, should not be barred from asserting his concomitant rights thereby.
In determining the issue of whether such a privilege exists, the previous proceedings in the matter on appeal could not but help play a role at the trial level in the actual disclosure *723 of the substance of the talk between James and Michael Fitzgerald.
On previous appeal of this case to the New York State Court of Appeals, the People had included in the appellate record the actual transcript of James Fitzgerald’s Grand Jury testimony. For all practical purposes, the substance of the conversation between parent and child became a public matter at that time. Any further disclsoure by James Fitzgerald’s attorney of the same exhibit in his motion raising the privilege in this court is merely secondary. The issue of whether a privilege may exist must, by necessity, examine the circumstances surrounding the alleged confidential communication and the substance thereof to determine whether such may properly fall within the rationale of the privilege and be itself, both "confidential” and a "communication”, or be beyond protection.
Were the record of the disclosure not already public, perhaps such a motion should have been made with a sealed exhibit for the eyes of the court only to prevent its open disclosure to the public. However, this court, seeing little benefit to be derived from now sealing such proceedings before it nunc pro tunc, overruled the application of Michael Fitzgerald’s cocounsel, Mr. Tully, to do so. On its own examination of James Fitzgerald, this court chose not to bring out the substance of the communications between father and son on December 24, 1975, as it was already before the court by the motion. However, this court also specifically overruled the timely objection of James Fitzgerald’s attorney to the People’s cross-examination of the father on the substance of the communication. Whatever the propriety of this court’s rulings on this matter, it cannot be said that a waiver of privilege by father or son can be inferred by disclosure under this court’s mandate, (cf. People v Shapiro, 308 NY 453; Matter of Topliffe, 191 Misc 466, affd 274 App Div 760; Kaufman v Rosenshine, 97 App Div 514, affd 183 NY 562.)
In sum, this court finds that James Fitzgerald has not waived his protection under a parent-child privilege claim and even if it be deemed he has, such waiver cannot effect the jointly existing and independent right of his son to claim such a privilege.
E. DOES A PARENT-CHILD PRIVILEGE EXIST IN THE FACTS OF THIS CASE?
There is no contested issue of James and Michael Fitzgerald *724 being father and son. From the hearing conducted in this matter, the court makes the following findings of fact. In December, 1975, Michael Fitzgerald, the 23-year-old son of James Fitzgerald, had been living apart from his father’s residence for a year or two. Michael had attended college away from home for approximately six months at age 19; he had returned to Briarcliff Manor to become a local policeman for a short while; had then become a New York City fireman until put on layoff status, and then worked at part-time jobs in the local post office and liquor store. Michael, his father James and his grandfather all lived in separate residences in the Village of Briarcliff Manor. At this time, Michael saw his father frequently, at least twice a week, at which time his father gave him the "normal father and son encouragement,” "the advice that a father would normally give a son,” and "things of that nature.” During the course of Michael’s youth, James had given his son advice while in residence over the years.
The accident in question took place on December 22, 1975 at approximately 10:00 p.m. James saw his son Michael on December 23. However, no conversations took place concerning the accident. On the morning of December 24, Michael Fitzgerald went to his father’s home and told him that he wanted to show him the family station wagon which was at his grandfather’s home nearby. No one but father and son were present at this time. They both went briefly to Michael’s grandfather’s home and together inspected the vehicle. They returned to James Fitzgerald’s home. While alone together, they had a 15- to 20-minute conversation wherein father and son discussed the traffic accident of December 22. Michael related in substance that it was possible he may have been involved in the accident while driving the family station wagon. While not explicitly stated by either party, James Fitzgerald "assumed” such conversation was in confidence. Michael asked for his father’s advice and James Fitzgerald told him that "we would get an attorney and that we should talk to the attorney and discuss the case and see what recommendations should be made from there.” Later that same day, Michael’s present attorney, John Keegan, Esq., was contacted and Mr. Keegan and Michael went down to the police station together.
On these facts, this court holds that this is a classic example for the application of a parent-child privilege, deems the *725 discussions of December 24, 1975 as being a "confidential communication” between a father and son and precludes the People from compelling disclosure from the father on such matters. The conversation was intended by both parties for the purpose of obtaining support, advice and guidance.