**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Mohammed ISMAIL, Defendant-Appellant.**

No. 84–1489.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 21, 1985.

Decided March 18, 1985.

David W. McMorrow (argued), Ryan, Ryan and McMorrow, Kalamazoo, Mich., for defendant-appellant.

John A. Smietanka, U.S. Atty., Thomas J. Gezon (argued), Grand Rapids, Mich., for plaintiff-appellee.

Before CONTIE and WELLFORD, Circuit Judges, and PECK, Senior Circuit Judge.

CONTIE, Circuit Judge.

Mohammed Ismail, a Pakistani national, appeals from a judgment entered after a jury convicted him of conspiring to import and distribute heroin (Count I), of importing heroin (Count II) and of using a communication facility to facilitate the importation and distribution of heroin (Count III). Ismail contends that the district court should not have permitted his son to testify against him because of an asserted parent-child privilege, that the court should not have admitted testimony about two collateral criminal acts under Federal Rule of Evidence (FRE) 404(b) and that the court should have ordered a new trial because the government failed, albeit unintentionally, to produce one piece of exculpatory

evidence after defense counsel had made a specific request. Finding none of these arguments meritorious, we affirm the judgment of the district court.

## I.

On April 5, 1983, a United States Customs Service official at Kennedy Airport in New York opened a mailed package entering this country from Karachi, Pakistan. The package, which was addressed to Valerie Davis of 1124 Dunham Street, Grand Rapids, Michigan, contained two boxes. Each box in turn contained 220 grams of approximately ninety percent pure heroin. The Customs Service forwarded the package to the Drug Enforcement Administration (DEA) which replaced the heroin with a fake substance, placed an electronic beeper in the package and executed a controlled delivery to the addressee.

After the delivery, DEA agents observed the Davis home for several hours until the electronic beeper's signal began to fade. After obtaining a search warrant, the agents searched the home and recovered the package. Davis then told the agents that a man named Lorenzo Johnson had offered her $200 if she would receive the package for him. The agents asked Davis to telephone Johnson and she complied. Johnson arrived shortly thereafter, paid Davis $250 and then left. He was arrested following a brief car chase.[1]

When arrested, Johnson had on his person approximately $4,600 in cash, two black address books and numerous small pieces of paper. One address book contained names and telephone numbers. On the second page of the book appeared the name "Ismile," the notation 107–C and a telephone number. It was later determined that defendant Ismail had once rented apartment 107–C of the Amsterdam Apartments in Grand Rapids. In a separate section of this address book appeared accounts that Johnson had maintained with named

individuals. At least one of these accounts had separate columns labeled "boy" and "girl." DEA Agent Robins testified that in street parlance, "boy" means heroin and "girl" means cocaine. Thus, the accounts appeared to be records of drug transactions. The appellant's name did not appear among these accounts.

The DEA agents found Ismail's Karachi, Pakistan business card among the seized pieces of paper. The agents also found a 5 × 7 piece of paper in Ismail's handwriting. The document was labeled "Statement of Account as on Jan. 31, 1983." The statement indicated that between October 1982 and January 1983, Johnson had paid $37,400 for 415 grams of an unspecified item. Johnson had been supplied with three boxes containing 220 grams, 220 grams and 180 grams respectively of an unspecified item for a total of 620 grams. This total multiplied by $90 per gram yielded "total supplies" of $55,800. Subtracting the $37,400 already paid resulted in a "final balance" of $18,400. To this amount the statement added "previous dues" of $13,600 for a "total balance" of $32,000. Also included was the notation "CAR–$475."[2] The statement concluded with the words "all previous statements are now destroyed."

DEA Agent Robins and three other agents arrested Ismail on December 2, 1983 at Ismail's recently purchased Grand Rapids home. After being informed of his constitutional rights, Ismail gave Robins a pre-typed letter which chronicled Ismail's life history, which denied any involvement in narcotics trafficking and which stated that Ismail had met Johnson through his son's first wife. The letter also stated that Johnson, like all of Ismail's friends, had been given the Karachi business card so that Ismail could entertain him if he ever visited Pakistan.

After reading the letter, Agent Robins confronted Ismail with the Statement of

[1]. Shortly after being released on bond, Johnson was murdered. The government does not contend that defendant Ismail was connected with that crime.

[2]. The government introduced evidence that Ismail had sold a car to Johnson.

Account that had been found on Johnson. Robins testified that Ismail then responded, "yes, Mr. Robins, we have to talk" (Tr. at 343). Robins further testified that Ismail eventually stated, "yes, I know. I have never sold any heroin, but I made arrangements for the heroin to come to Grand Rapids" (Tr. at 343–44).

In addition to Robins' testimony about Ismail's oral statement, the address book and the various slips of paper (including the Statement of Account), the government produced two witnesses who testified that $90 per gram was a reasonable price for heroin entering the United States. Davis testified that Johnson had referred to Ismail as a "connection," although the type of connection that Johnson had meant was not specified. The government also introduced a gram measuring scale and various financial records.

Furthermore, the government subpoenaed Ismail's son, Azhar, to testify. Azhar was thirty years old and was a United States citizen living in Grand Rapids at the time of the trial. He had previously been subpoenaed to testify before the grand jury. To protect his father, he had lied by testifying that he knew nothing about his father's alleged involvement in drug trafficking. Azhar subsequently approached the United States Attorney about the grand jury testimony. He apparently wanted to tell the government the truth without having to testify against his father at a public trial.[3] The subpoena to testify at trial followed.

Both the appellant and his son subsequently asserted the parent-child privilege. After the district court rejected this claim, Azhar agreed to testify fully in return for a promise that he would not be prosecuted for his perjured grand jury testimony. Defense counsel objected to any testimony regarding the appellant's prior criminal conduct. The district court overruled this objection on the ground that the testimony was admissible under F.R.E. 404(b).

Azhar testified that his father had visited the United States on numerous occasions since 1977. Azhar stated that on the first visit, he met his father at a Chicago airport and drove him to Grand Rapids. During the trip, the appellant confided that he had cocaine to sell. He showed Azhar the cocaine when they reached Grand Rapids. Azhar testified that although his father sold the cocaine, the deal later was rescinded because the cocaine was of poor quality. According to Azhar, his father then discarded the cocaine.

Azhar next testified that during the first or second visit, his father asked to be introduced to someone who dealt in drugs. Although reluctant to do so, Azhar introduced his father to Johnson. Azhar further testified that during the third or fourth visit [4] his father confided that he possessed hashish which he intended to sell to Johnson. Although Azhar never saw his father sell hashish to Johnson, the appellant told Azhar that he had done so.

Finally, Azhar testified that he eventually tried to disassociate himself from his father. In April 1983, for instance, the appellant sent an envelope to Azhar containing a letter to be sent to Johnson. Azhar testified that he destroyed the letter without reading it.

Ismail's defense was to deny all involvement in drug trafficking. Although Ismail admitted that he knew Johnson, he claimed that he and Johnson had engaged in bulk transactions in precious stones, gems and inexpensive jewelry. He denied admitting to Agent Robins that he had mailed the package of heroin to the United States. Moreover, Ismail presented evidence that $90 per gram was a reasonable price for bulk sales of precious stones, gems and

---

**3.** The record shows that Azhar experienced strong guilt feelings about testifying against his father. Azhar had considered suicide and began crying during preliminary testimony regarding the parent-child privilege. The record also indicates that other members of the Paki-

stani community in the Grand Rapids area ostracized Azhar for testifying.

**4.** The appellant's third visit to the United States occurred in July and August 1978. The fourth visit took place from January to April 1979.

jewelry. Furthermore, a defense expert testified that ninety percent pure heroin would wholesale for $300–$400 per gram rather than $90 per gram as stated by the government's witnesses. Ismail contended, therefore, that the Statement of Account found on Johnson was a record of transactions in precious stones, gems and jewelry rather than a record of heroin sales.

Ismail also presented evidence that he had several businesses in Pakistan. The apparent purpose of this evidence was to show that he had obtained all of his money from sources other than drug dealing. Finally, the appellant attacked the credibility of his son. Defense counsel attempted to impeach Azhar on cross-examination with the latter's grand jury testimony. The subject of Azhar's possible mental instability was broached. Furthermore, a defense witness stated, contrary to Azhar's testimony, that he had accompanied Azhar and the appellant on the drive from Chicago to Grand Rapids in 1977 and that cocaine had not been mentioned.

After the jury returned a verdict of guilty, the court ordered the preparation of a pre-sentence report. The completed report mentioned that Johnson had possessed a second black address book and a chrome matchbox at the time of his arrest.[5] Although the defense had made a specific request for Johnson's address book before trial, the government had not produced the second address book. This address book contained both pages for recording names, addresses and phone numbers and a separate writing pad. Although the government had thought that the address book was completely blank, it actually contained one entry on the last page of the writing pad. The notations "7 oz.-18 grams" and "6 oz.-22 grams" appeared at the top of the page in question. A partial division of the number 190 by the number 28 appeared in the middle of the page. Below the partial calculation was the underscored notation "FRIST (sic) PKG." At the bottom of the

page, the notation "190 grams Joe" was circled.

On the basis of this entry in the second address book, present defense counsel moved for a new trial. Counsel's theory was that the entry connected a transaction involving a large number of grams to a person other than Ismail. According to counsel, the entry tended to show that someone named "Joe" had supplied the 440 gram package that had been intercepted at Kennedy Airport. Reading the notation "FRIST (sic) PKG" to mean "first package," counsel theorized that the "Joe" who had supplied the 190 gram "first package" had subsequently mailed the 440 gram package of heroin from Pakistan.

The district court denied the motion on the ground that the new evidence was vague, inconclusive and cumulative. The court noted that there was no way to discern the substance to which the notation "190 grams Joe" referred. Second, the court declined to accept the hypothesis that because the entry in the second address book referred to 190 grams, "Joe" necessarily must have been a supplier rather than a buyer. Third, the court noted that Johnson's other address book had contained numerous accounts about various persons who had engaged in drug transactions with Johnson. The name "Joe M." had appeared on one of these accounts. The court ruled that presenting one additional account not containing the only reference to "Joe" would have made no difference to the jury. The court proceeded to sentence Ismail to fifteen years on the conspiracy count, to fifteen years on the importation count and to four years on the use of a communication facility count. The sentences were to run concurrently. The court also imposed fines totalling $80,000. Ismail then filed a notice of appeal.

## II.

Ismail initially contends that his son's testimony was inadmissible under F.R.E. 501 because both he and his son possessed an evidentiary privilege. Analogizing to

5. The chrome matchbox is not at issue on this appeal.

*Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980) (spousal privilege), Ismail contends that he was entitled to prevent his son from testifying about confidential communications, 445 U.S. at 51, 100 S.Ct. at 912; *see also Blau v. United States,* 340 U.S. 332, 333, 71 S.Ct. 301, 302, 95 L.Ed. 306 (1951) (spousal confidential communications privilege); *Wolfle v. United States,* 291 U.S. 7, 14, 54 S.Ct. 279, 280, 78 L.Ed. 617 (1934) (same), and that his son was entitled to refuse to testify at all, *Trammel,* 445 U.S. at 53, 100 S.Ct. at 913.

We disagree. The parent-child privilege did not exist at common law. Although this court has the power to recognize new evidentiary privileges under common law principles as interpreted in light of reason and experience, *id.* at 47, 100 S.Ct. at 910, this power must be used sparingly. Since "testimonial exclusionary rules and privileges contravene the fundamental principle that 'the public ... has a right to every man's evidence'," *id.* at 50, 100 S.Ct. at 912, such privileges:

> Must be strictly construed and accepted "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." [Citations omitted].

*Id.*

Analogous to the spousal privilege, the parent-child privilege purportedly would serve the public interest in preserving the harmony and confidentiality of the parent-child relationship. *Cf. Trammel,* 445 U.S. at 44, 100 S.Ct. at 909 (spousal privilege fosters "the harmony and sanctity of the marriage relationship"). Despite this laudable goal, however, the vast majority of federal courts have refused to recognize a family privilege under F.R.E. 501 extending beyond the spousal privilege. *See In re Grand Jury Subpoena (Santarelli),* 740 F.2d 816, 817 (11th Cir.1984); *United States v. (Under Seal),* 714 F.2d 347, 349 n. 4 (4th Cir.), *cert. dismissed,* —— U.S. ——, 104 S.Ct. 1019, 78 L.Ed.2d 354 (1983); *In re Matthews,* 714 F.2d 223, 224 (2d Cir.1983); *United States v. Jones,* 683 F.2d 817, 819 (4th Cir.1982); *United States ex rel. Riley v. Franzen,* 653 F.2d 1153, 1160 (7th Cir.), *cert. denied,* 454 U.S. 1067, 102 S.Ct. 617, 70 L.Ed.2d 602 (1981) (applying Illinois law); *In re Grand Jury Proceedings (Starr),* 647 F.2d 511, 512–13 (5th Cir.1981); *United States v. Penn,* 647 F.2d 876, 884 (9th Cir.1980) (*en banc*); *In re Grand Jury Proceedings (Greenberg),* 11 Fed.R.Ev.Serv. 579, 585–87 (D.Conn.1982);[6] *In re Grand Jury Subpoena (Kinoy),* 326 F.Supp. 400, 406 (S.D.N.Y.1970). *But see In re Agosto,* 553 F.Supp. 1298 (D.Nev. 1983); *People v. Fitzgerald,* 101 Misc.2d 712, 422 N.Y.S.2d 309 (Westchester County 1979).

◼ Moreover, Azhar Ismail is an emancipated adult who has not lived in the same country as his father for many years. We do not address situations involving, for instance, unemancipated minors who generally require much greater parental guidance and support than do emancipated adults. We hold only that an emancipated adult, if subpoenaed, must testify against a parent at a criminal trial. The district court correctly refused to recognize the parent-child privilege under the facts of this case.

## III.

◼ Ismail's second argument is that his son's testimony about the prior hashish and cocaine transactions should not have been admitted under F.R.E. 404(b). The law is clear, of course, that evidence of past criminal activity is inadmissible to show criminal propensity. *See, e.g., United States v. Davis,* 707 F.2d 880, 884 (6th Cir.1983); *United States v. Reed,* 647 F.2d 678, 686 (6th Cir.), *cert. denied sub nom. Lawson v. United States,* 454 U.S. 1037,

---

**6.** The *Greenberg* court rejected the parent-child privilege under F.R.E. 501. It also held that the parent in that case possessed a privilege not to testify against a daughter on First Amendment free exercise of religion grounds. Since no First Amendment argument has been raised in this case, the portion of *Greenberg* finding an evidentiary privilege is inapposite.

102 S.Ct. 580, 70 L.Ed.2d 483 (1981); *United States v. McFadyen-Snider*, 552 F.2d 1178, 1183 (6th Cir.1977); *United States v. Largent*, 545 F.2d 1039, 1043 (6th Cir.1976), *cert. denied*, 429 U.S. 1098, 97 S.Ct. 1117, 51 L.Ed.2d 546 (1977); *United States v. Ring*, 513 F.2d 1001, 1004 (6th Cir.1975). Before admitting prior acts evidence, the district court must determine that the evidence is admissible for a proper purpose and that the probative value of the evidence outweighs its potential prejudicial effects. *See, e.g., United States v. Dabish*, 708 F.2d 240, 242 (6th Cir.1983); *United States v. Vincent*, 681 F.2d 462, 465 (6th Cir.1982). The district court has broad discretion in balancing probative value against potential prejudicial impact. *Dabish*, 708 F.2d at 242; *Vincent*, 681 F.2d at 465. Furthermore, the prior acts generally must be relevant to a matter at issue and must be substantially similar to, and near in time to, the offense charged in the indictment. *See, e.g., United States v. Hamilton*, 684 F.2d 380, 384 (6th Cir.), *cert. denied*, 459 U.S. 976, 103 S.Ct. 312, 74 L.Ed.2d 291 (1982); *McFadyen-Snider*, 552 F.2d at 1183; *Largent*, 545 F.2d at 1043.[7]

Ismail contends that the testimony about hashish and cocaine was not admitted for a proper purpose, that the other acts were not similar to or near in time to the offenses charged in the indictment and that the evidence was far more prejudicial than probative. Ismail especially emphasizes that his son's testimony did not link Johnson to the cocaine transaction. Consequently, evidence of that transaction is said to be irrelevant to the nature of the relationship between Ismail and Johnson or to any other issue.

■ We do not agree with Ismail that the district court erred in admitting the hashish and cocaine evidence. This evidence showed that Ismail was involved in an ongoing scheme or plan to import controlled substances illegally and to sell them in the Grand Rapids area. That Ismail had such a scheme or plan was highly probative in evaluating his claim that he was a legitimate businessman traveling to this country in order to make bulk sales of precious stones, gems and inexpensive jewelry. Moreover, the evidence that Ismail and Johnson jointly schemed to traffic in hashish was highly relevant to the true nature of their relationship and to the element of agreement on the conspiracy count. Although we may assume that some prejudice potentially inhered in the testimony concerning hashish and cocaine, we note that the district court gave a strong cautionary instruction about the limited permissible use of the other acts evidence both immediately after Azhar Ismail testified and during the general jury instructions. In so doing, the district court helped to insure that the appellant would not be prejudiced by the introduction of the hashish and cocaine evidence. *See Ring*, 513 F.2d at 1004. We hold that the other acts evidence was admissible for a proper purpose and that the district court did not abuse its discretion in balancing probative value against potential prejudicial impact.

■ Furthermore, we hold that the hashish and cocaine transactions were similar to, and sufficiently near in time to, the offenses charged in the indictment. As to the similarity requirement, the evidence concerning heroin, hashish and cocaine all related to Ismail's plan to import controlled substances illegally and to sell them in the Grand Rapids area. Although different controlled substances were involved in the three transactions and although the hashish and cocaine transactions did not involve use of the mails, the illegal importation of hashish and cocaine, in our judgment, sufficiently resembled the importation of heroin so as to be admissible under Rule 404(b).

---

7. The similarity requirement may be dispensed with, however, if similarity is not a basis of relevance of the prior acts. *See United States v. Czarnecki*, 552 F.2d 698, 702 (6th Cir.), *cert. denied*, 431 U.S. 939, 97 S.Ct. 2652, 53 L.Ed.2d 257 (1977); *McFadyen-Snider*, 552 F.2d at 1183.

Nevertheless, since the prior acts in this case were designed to show a scheme or plan on the part of Ismail to violate federal drug laws, the exception to the similarity requirement is inapplicable.

See *Dabish,* 708 F.2d at 243. The rule that the other crime "must be so similar as to be a 'signature' of the defendant," *Hamilton,* 684 F.2d at 384, does not apply here because the hashish and cocaine evidence was admissible to prove scheme or plan rather than identity. The *Hamilton* case involved the issue of identity.

 Regarding the nearness in time question, the rule is that the prior conduct must be reasonably near in time under the facts of the particular case. *Ring,* 513 F.2d at 1005; *United States v. Foley,* 683 F.2d 273, 278 (8th Cir.), *cert. denied,* 459 U.S. 1043, 103 S.Ct. 463, 74 L.Ed.2d 613 (1982); *United States v. Engleman,* 648 F.2d 473, 479 (8th Cir.1981). There is no absolute maximum number of years that may separate a prior act and the offense charged. *See United States v. Rubio-Gonzalez,* 674 F.2d 1067, 1075 (5th Cir.1982) (ten-year old conviction admitted); *Foley,* 683 F.2d at 278 (eleven-year old conviction admitted under Rule 404(b)); *Engleman,* 648 F.2d at 479 (thirteen-year old conviction admitted). In the present case, the indictment alleged that the conspiracy to import and distribute heroin began on October 1, 1981. The hashish transaction took place in mid-1978 or early 1979. The cocaine transaction occurred in late 1977. Although the other acts occurred between two and four years before the time period specified in the indictment,[8] the record in this case demonstrates a pattern of frequent travel by Ismail between Pakistan and Grand Rapids from 1977 onward. The other acts under review occurred during two of these visits. We are convinced that while the prior acts occurred between two and four years before October 1, 1981, those acts were part of an ongoing plan to import controlled substances illegally and to sell them in the Grand Rapids area. Hence, the prior acts were sufficiently near in time so as to be probative of Ismail's actual business activities in Grand Rapids

during the time period specified in the indictment.

 As has been indicated, evidence of the cocaine transaction was highly relevant to whether Ismail had a plan to import controlled substances illegally but was not relevant to whether the particular business relationship between Ismail and Johnson was legitimate. Assuming *arguendo* that the admissibility of the testimony about the cocaine transaction depended upon its relevance to the latter question, we hold that any error in admitting the evidence was harmless. Whether the improper admission of evidence under F.R.E. 404(b) constitutes prejudicial error or harmless error must be decided on the facts of each case. *United States v. Wells,* 431 F.2d 432, 433–34 (6th Cir.), *cert. denied,* 400 U.S. 967, 91 S.Ct. 380, 27 L.Ed.2d 388 (1970); *United States v. Johnson,* 610 F.2d 194, 196 (4th Cir.1979), *cert. denied,* 446 U.S. 911, 100 S.Ct. 1840, 64 L.Ed.2d 264 (1980). This court has held that the standard articulated in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), should be used in making such a determination. *See United States v. Reed,* 647 F.2d 678, 687 (6th Cir.1981). *See also United States v. Davis,* 657 F.2d 637, 640 (4th Cir.1981); *United States v. Straughan,* 453 F.2d 422, 426 (8th Cir.1972).

The Court stated in *Kotteakos* that the record must be considered as a whole from the perspective of how the error might have affected the jury. 328 U.S. at 764, 66 S.Ct. at 1247. The test is:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand.... But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.

---

**8.** Other acts evidence may be admitted under appropriate circumstances even if the acts occurred outside the conspiracy period specified

by the indictment. *See United States v. Smith,* 504 F.2d 560, 561 (5th Cir.1974).

The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

*Id.* at 764–65, 66 S.Ct. at 1247–48.

Even assuming that the testimony about the cocaine transaction should not have been admitted, the error could not have substantially influenced or swayed the jury's decision. First, Agent Robins testified that Ismail admitted, after being confronted with the Statement of Account, that he had "made arrangements for the heroin to come to Grand Rapids." Contrary to the appellant's assertion, therefore, the conviction in this case does not rest solely upon circumstantial evidence. Second, the testimony about the hashish transaction clearly was admissible. *See supra.* Under these circumstances, any prejudice resulting from the admission of prior criminal acts would have occurred despite the absence of evidence about the cocaine transaction. Thus, any error in admitting the testimony about cocaine was harmless.[9] *See United States v. Marshall,* 683 F.2d 1212, 1215 (8th Cir.1982).

## IV.

■ Ismail's final argument is that the district court should have ordered a new trial because the government failed to produce Johnson's second address book for which a specific request had been made.[10] The Supreme Court has held that if the government fails to produce exculpatory evidence after receiving a specific request, a new trial must be ordered if "the suppressed evidence might have affected the outcome of the trial." *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976). That the government's failure to produce the evidence was completely unintentional or inadvertent (as it was here) is irrelevant. *Id.* at 110, 96 S.Ct. at 2400.

■ Having considered Ismail's arguments, we are convinced that presenting the entry on the note pad in the second address book to the jury would not have affected the outcome of the trial. The notation clearly did not refer to the package of heroin involved in this case because the number of grams specified was far too small. Nor did the notation indicate what substance was involved or whether "Joe" was a supplier or buyer. Moreover, the jury was fully aware that the first address book contained numerous names of persons with whom Johnson had maintained drug accounts. The theory that someone other than Ismail had mailed the package was fully explored and the addition of one more such account would not have made a difference. Furthermore, Agent Robins testified that Ismail admitted arranging for the heroin to enter this country. We reiterate that contrary to Ismail's assertion, this conviction does not rest wholly upon circumstantial evidence. Although the government should have produced the entry in the second address book and deserves criticism for not doing so, the failure to produce the

---

**9.** We do not address situations involving the improper admission either of inflamatory testimony or of another crime more heinous in nature than the properly admitted collateral crime.

**10.** At one point in the proceedings, the district court stated that Ismail had made a specific request for the address book (Tr. at 937). At another point, the court stated the opposite conclusion (Tr. at 945). The parties agree, as does this court, that Ismail made a specific request for the address book. We analyze this assignment of error accordingly.

Our decision in *United States v. Barlow,* 693 F.2d 954, 966 (6th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983), does not apply to the question at hand. The *Barlow* standards govern the treatment of a motion for new trial on the basis of newly discovered evidence where the new evidence is obtained from the government, which had a duty to disclose but did not do so. Accordingly, Ismail need not demonstrate that the new evidence likely would have resulted in an acquittal. *Cf. United States v. Agurs,* 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976) (even if the defendant did *not* make a specific request for exculpatory evidence, the defendant need not demonstrate that the new exculpatory evidence would have resulted in an acquittal).

entry could not have affected the outcome of the trial. Under these circumstances, the appellant's assignment of error must be rejected.

The judgment of the district court is AFFIRMED.