THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIAM KIRKMAN, Defendant-Appellant.

First District (5th Division)   No. 85—2335

Opinion filed February 19, 1988.

PINCHAM, J., dissenting.

Steven Clark and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Paula Carstensen, and Eugene K. Hollander, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

This is an appeal by defendant from a 1985 conviction by a trial court in a bench trial finding defendant guilty of voluntary manslaughter and concealment. Defendant was sentenced on July 16, 1985, for 15 years on the manslaughter conviction and three years on the concealment conviction. Both sentences were to run concurrent.

The public defender of Cook County represented defendant at the trial and initially in this appeal. The public defender of Cook County filed a motion to withdraw as appellate counsel, determining that there was no issue of merit. This court then appointed the State appellate defender to represent defendant in this appeal.

There are suggestions in the record that promises by an assistant State's Attorney were made that psychiatric help would be obtained for defendant if his mother, sister and brother-in-law would testify before the grand jury. On the other hand, the appellate defender raises only two issues on appeal. They are:

(1) That Kirkman (defendant) did not exhibit an intent to conceal the deceased homicidal death and therefore the conviction should be reversed; and

(2) Whether where the deceased attacked Kirkman with a knife while voicing her intent to kill him, William Kirkman was justified in using deadly force to defend himself.

The issue of unfulfilled promises by the assistant State's Attorney was first raised by defendant's trial counsel in a motion to quash

the grand jury proceedings and to exclude testimony. At the hearing on the motion to quash, the assistant State's Attorney testified, in part, as follows:

"Q. Now during the course of your interviews with the defendant's mother, his sister and brother-in-law, did you ever make any promises to him concerning this case?

A. No, I did not.

Q. Specifically, sir, did [you] ever make any representations to them concerning the sanity or psychological well being of the defendant as you knew it to be on that date?

A. No.

\* \* \*

Q. How did you respond when she asked you if the defendant would be allowed to plead guilty to insanity?

A. Mrs. McCloud asked me if her son could plead guilty to insanity and get some help, that he needed help. I told her that what his defense would be was up to his lawyer. Although I did tell her it sounded like he needed help."

Based on this and other testimony, the trial court order denied Kirkman's motion to quash.

The psychiatric report in response to a trial court order concludes:

"Overall, the intellectual pattern that emerges is an unreflective, action-oriented person whose judgment is poor, whose intellectual development is weak, but whose grasp of social situations is not severely impaired."

The State has had no opportunity to address this issue on appeal.

Finally, if, in fact, the issue is error tainting the trial, it is one that the proper administration of justice impels its determination by a full hearing rather than by being addressed *sua sponte* by an appellate court. Our post-conviction remedy contemplates such a hearing if an error rises to a constitutional level. Ill. Rev. Stat. 1985, ch. 38, par. 122—1 *et seq.*

On the issues that have been raised by defendant and responded to by the State, we affirm for the following reasons.

At trial the evidence presented, primarily through stipulation, established that defendant and the victim, Harriet Price, had been dating for several months, and that defendant was living with the victim and her mother. Although the relationship between defendant and the victim had allegedly ended, defendant was still living with her. On the evening of January 13, 1984, the victim was home with defendant and her two girl friends, Carol Frazier and Katherine Col-

lins. The victim and defendant began to argue, and when she asked defendant to leave, he refused. As she started to call the police, defendant hit the victim in the face, causing her to fall to the floor. Defendant then left. Shortly after this incident, the victim and her two friends went out and did not return home until 5 a.m. the next day. At that time defendant was speaking on the telephone with his mother, Deloyce Kirkman. The victim spoke with defendant's mother and agreed to meet her at the latter's house later that day.

At 1 p.m. the victim went to meet Deloyce Kirkman, but when she arrived at the house, defendant was the only one there. She then began arguing with him, and at one point she asked defendant to bring her a glass of water. Defendant refused and told the victim to get it herself.

According to the testimony of Glen McCloud, who is defendant's brother-in-law and who recounted what defendant had told him about the incident, the victim came back from the kitchen with a knife and threatened to stab defendant. The victim was 4 feet 11 inches tall and weighed 118 pounds; defendant was 6 feet tall and weighed 145 pounds. As the victim came toward him with the knife, defendant grabbed her around the throat allegedly in self-defense. Shortly thereafter her knees buckled and she fell to the floor. Defendant then realized that he had killed her.

Deloyce Kirkman worked at a bar on the first floor of the building where she lived. About 4 p.m. on the day of the occurrence she went to her apartment and found that an ashtray and game were on the floor and that a table was out of place. Defendant was in the bathroom with the water running. When Deloyce Kirkman asked about the condition of the apartment, defendant replied that he tripped when he went to answer the door.

At 7 p.m. defendant contacted McCloud, went to his house and told him that he had killed the victim. He described the events leading up to her death and told McCloud that the victim's body was under the stairway of his mother's house. McCloud reported defendant's conversation to Deloyce Kirkman, who then called the victim's house, but found no one at home. She then took a flashlight and used it to illuminate the darkened stairway where the victim's body was allegedly hidden, but saw nothing. McCloud then found defendant and accused him of fabricating the story of victim's death. Defendant stated he had no reason to lie and that the victim's body was under the steps. Sometime later, defendant told Deloyce Kirkman that he had killed the victim, placed her body in a laundry bag and placed it behind the stairway.

At 7 a.m. the next day, defendant asked McCloud to help him flee. McCloud refused, stating that he did not believe defendant's story because he could not find a body. Defendant continued to insist that the body was where he originally said it was. Deloyce Kirkman, who had been calling the victim's residence attempting to locate her, at this time called the police. At 10:30 a.m. Deloyce Kirkman went down the stairway and found the victim's body. Officer Rivera arrived at 1 p.m., was shown the victim's body and contacted additional officers. Shortly thereafter, defendant called his mother from his stepmother's house, and Officer Rivera was informed of defendant's location. Officers Guiffre and Nakutis subsequently arrested defendant at this location.

The pathologist's testimony was also presented by stipulation. His examination of the victim revealed a number of abrasions to her head, face, neck, chest and back. He also found that her left neck bone was fractured, and that the cause of death was strangulation.

As indicated above, defendant brings this appeal, contending only that the evidence did not support his conviction for concealment of a homicidal death and that his conviction for voluntary manslaughter was also improper because he killed the victim in self-defense.

I

■ Concealment of a homicidal death is governed by section 9—3.1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—3.1) which states:

> "(a) A person commits the offense of concealment of homicidal death when he conceals the death of any other person with knowledge that such other person has died by homicidal means."

In order to establish that the offense of concealing a homicidal death has occurred, the evidence must show that a homicide has occurred, that the defendant knew both the fact and cause of death and that defendant took affirmative steps to conceal the homicide with the specific purposes of preventing or delaying its discovery. (*People v. Stiles* (1977), 46 Ill. App. 3d 359, 360 N.E.2d 1217.) Concealment of a homicidal death includes situations where the homicidal nature of the death or the body itself is concealed. *People v. Vath* (1976), 38 Ill. App. 3d 389, 347 N.E.2d 813.

■ In the instant case a homicide occurred when the victim was strangled by defendant, and defendant revealed his knowledge of the fact and cause of the victim's death when he first informed his brother-in-law that he had killed her. Defendant also took affirmative

action and intentionally concealed the victim's body when he placed it in a laundry bag and hid the body from view.

Defendant argues that he should not have been convicted of concealing a homicidal death because he made no attempt to conceal the fact of the victim's death, and in fact, facilitated the discovery of her body. Although defendant did inform his family of the circumstances of the victim's death, he intentionally concealed her body, and only moved it to a location where it could be discovered when defendant's brother-in-law stated that he did not believe defendant's story because he could not find the body. Even though a defendant may reveal the location of a victim's body several days after the homicide has occurred, the initial concealment of the victim's body constitutes an offense. *People v. Mueller* (1985), 130 Ill. App. 3d 385, 474 N.E.2d 434.

For these reasons, we find that defendant's conviction for the concealment of homicidal death was proper.

## II

■■ ■ Both the offense of voluntary manslaughter under section 9—2(b) of the Criminal Code (Ill. Rev. Stat. 1983, ch. 38, par. 9—2(b)) and self-defense under section 7—1 of the Criminal Code (Ill. Rev. Stat. 1983, ch. 38, par. 7—1) involve the issue of whether a defendant subjectively believed that force was justified for his self protection. Once there is a finding that defendant believed force was justified, the next determination is whether or not defendant's belief is found to be reasonable. Once it is found to be unreasonable, a conviction for voluntary manslaughter results. (*People v. O'Neal* (1984), 104 Ill. 2d 399, 472 N.E.2d 441.) In order to establish self-defense, defendant must show that unlawful force was threatened against him, that he was not the aggressor, and that the amount of force used was necessary to protect himself from imminent harm. *People v. Jordan* (1985), 130 Ill. App. 3d 810, 474 N.E.2d 1283.

■■ ■ Defendant was the only witness to the altercation between himself and the victim that resulted in her death. He claims that the victim threatened him with unlawful force when she came after him with a knife, and that the force he used was necessary to protect himself against this imminent harm. The trier of fact determines the credibility of the witnesses and the weight of their testimony. (*People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.) In the instant case, the trial court considered the evidence and found defendant's belief that he had to use deadly force was unreasonable. A reviewing court will not alter the determination of a trier of fact unless the evidence

justifies a reasonable doubt of guilt. (*People v. Jordan* (1985), 130 Ill. App. 3d 810, 474 N.E.2d 1283.) We conclude that the evidence corroborated the fact that defendant used more force than was necessary for his own self-defense where he was over one foot taller and 27 pounds heavier than the victim and exerted such force that he fractured a neck bone when he strangled her to death. Therefore, the trial court properly found defendant guilty of voluntary manslaughter.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

LORENZ, P.J., concurs.

JUSTICE PINCHAM, dissenting:

I dissent. Seeking support, consolation and advice, the defendant, William Kirkman, remorsefully confided to his mother, Mrs. Deloyce Kirkman, his sister, Marcia McCloud, and his brother-in-law, Glen McCloud, that he fatally choked his former girlfriend, Harriet Price, in defending himself against her knife-wielding unprovoked attack upon him while stating that she was going to kill him. His admissions to them were not designed to conceal the homicide or to avoid his possible apprehension, prosecution or punishment. According to them, the defendant's mother, sister and brother-in-law testified to the defendant's admissions to them before a grand jury solely because of the prosecutor's assurances to them that only by their doing so could the defendant plead insanity to the homicide charge against him arising out of Price's death and receive the psychiatric treatment which the defendant needed. Based thereon, the defendant's court-appointed trial attorney filed a motion to quash the indictment and to exclude the grand jury testimony of the defendant's mother, sister and brother-in-law. The trial court denied the motion based on what appears may have been erroneous grounds.

At trial, the defendant's attorney stipulated to the admission of the grand jury testimony of the defendant's mother, sister and brother-in-law as evidence against the defendant. The defendant's court-appointed appellate attorney has not pursued or assigned in this court the trial court's denial of the defendant's motion to quash the indictment and exclude the grand jury testimony as grounds for reversal of the defendant's conviction. Moreover, neither the defendant's trial nor appellate attorney has raised or pursued the defendant's insanity as a possible defense, which appears from the record

before this court to have been a meritorious justiciable issue.[1] Based upon the foregoing, it is my opinion that the record before us presents the additional meritorious justiciable issue of whether the defendant in the trial court and in this court has been afforded the effective assistance of counsel to which he is constitutionally guaranteed by the sixth amendment, made binding on the States by the due process clause of the fourteenth amendment to the Constitution of the United States (*Gideon v. Wainwright* (1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792; *Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019; *Grosjean v. American Press Co.* (1936), 297 U.S. 233, 243-44, 80 L. Ed. 660, 665, 56 S. Ct. 444, 446; *Powell v. Alabama* (1932), 287 U.S. 45, 77 L. Ed. 158, 53 S. Ct. 55), and by the due process and right of counsel clauses of article 1, sections 2 and 8, of the Constitution of the State of Illinois. In addition, the evidence did not establish beyond a reasonable doubt the defendant's guilt of voluntary manslaughter.

## I

Soliciting the consolation of his mother, sister and brother-in-law on Saturday, January 14, 1984, the defendant confided to them that earlier that day, his former girlfriend, Harriet Price, had come to the defendant's mother's home, ridiculed him and, while threatening to kill him, attacked him with a butcher knife. The defendant further told them that in defending himself against her attack he grabbed Price by the neck and choked her and that suddenly she felt limp, dead. He told them that he concealed her body in the stairwell of the building. Mrs. Kirkman and Glen McCloud ultimately found Price's

---

[1]The defendant's trial attorney was also the defendant's original attorney on appeal before this court. He filed in this court a motion pursuant to *Anders v. California* (1967), 386 U.S. 738, 18 L. Ed. 2d 493, 87 S. Ct. 1396, to affirm the conviction, contending that there were no issues of merit to be presented on the appeal, and requested leave to withdraw as the defendant's attorney. This court granted him leave to withdraw and appointed other counsel to represent the defendant on the appeal. The only issues his second counsel has briefed and assigned as error for reversal of the defendant's conviction by this court are whether the evidence established beyond a reasonable doubt the defendant's guilt of concealment of a homicide death and voluntary manslaughter. *Anders* mandates this court, "after a full examination of all the proceedings, to decide whether the case is wholly frivolous *** if it finds any of the legal points arguable on their merits (and therefore not frivolous) it must prior to decision afford the indigent the assistance of counsel to argue the appeal." My compliance with the *Anders* mandate to examine the proceedings for "legal points arguable on the merits" has disclosed the meritorious justiciable issues which I discuss in this dissenting opinion.

body where the defendant told them he had placed it. The police were called. They removed the body and arrested the defendant.

Three days later, on January 17, 1984, police officers went to Mrs. Kirkman's home and transported Mrs. Kirkman, her daughter and her son-in-law to the office of Assistant State's Attorney Thomas Gibbons in the criminal court building. Assistant State's Attorney Gibbons interviewed them and directed them to appear and testify before the grand jury. They did so, according to them, solely because of Gibbons' assurance and promises to them that only by their so testifying could the defendant plead insanity and obtain needed psychiatric and medical treatment.

Based exclusively on the testimony of the defendant's mother, sister and brother-in-law, the grand jury returned the indictment against the defendant. The indictment charged the defendant with the murder of Harriet Price by strangulation and with concealment of her homicidal death on January 14, 1984. Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), (a)(2), 9—3.1.

The defendant's court-appointed attorney filed a motion to quash the indictment and suppress the grand jury testimony. The attorney did not raise in the motion the parent-child privilege, the question of whether a mother's improperly and deceptively induced grand jury testimony by a prosecutor to indict and ultimately imprison her son violated the parent-child privilege, public policy, or the fundamental, basic and natural mother-son fidelity and bond. The motion to quash did not present the question of the propriety of the State transgressing the parent-child-sibling loyalties. The motion to quash the indictment and suppress was predicated on a violation of the prosecutor's promise and assurances to the defendant's mother, sister and brother-in-law that by reason of their grand jury testimony the defendant could plead insanity and would receive needed psychiatric treatment. The motion to quash the indictment alleged:

"1. Prior to defendant's indictment for the instant offenses the State's Attorney's office promised the witnesses who appeared before the grand jury that the State's Attorney of Cook County would not oppose psychiatric care for defendant.

2. Witnesses understood the State's representations to be a promise not to prosecute for murder.

3. Based on said promises the witnesses before the grand jury appeared without subpoena and waived benefit of counsel for both themselves and defendant.

4. All witnesses before the grand jury were defendant's relatives.

5. The wrongful inducements and misrepresentations by the State prejudiced defendant's right to equal protection and due process under the Illinois and United States Constitution[s]."

The motion prayed that the testimony of the grand jury witnesses be excluded and that the indictment be quashed.

Documents entitled "Affidavit" (but which were not sworn to) were each signed by Deloyce Kirkman, Marcia McCloud and Glen McCloud and were submitted with and in support of the defendant's motion to quash the indictment and suppress. Each affidavit stated:

"I hereby affirm that on January 17, 1984, I appeared before the Grand Jury of Cook County. Prior to testifying before said Grand Jury I spoke to Assistant State's Attorney Thomas Gibbons. Mr. Gibbons assured me that my testimony before the grand jury was a mere legal formality. He promised me that if I testified he would not oppose efforts to get psychiatric treatment for William Kirkman and that he would recommend insanity at the trial level. Because of the assistant State's Attorney's promise I did not consult a lawyer for myself or William."

The defendant's attorney also filed a motion entitled "Motion to Compel Compliance With A Promise." This motion alleged:

"1. Prior to the defendant's indictment for the instant offenses the State's Attorney's office promised the witnesses who appeared before the Grand Jury that the State's Attorney of Cook County would not oppose psychiatric care for defendant.

2. On March 12, 1984, the assistant State's Attorney assigned to the instant case opposed treatment for defendant and objected to an examination of defendant.

3. Said objection was in direct contradiction to the pre-indictment promise.

4. Based on said promise the witnesses before the Grand Jury appeared without subpoena and waived benefit of counsel for both themselves and defendant."

The motion to compel compliance with the promise prayed that the court "enter an order directing compliance with the pre-indictment promise."

The State filed a "Memorandum in opposition to Defendant's Motion to Quash Indictment," which stated:

"The State maintains that a slightly different conversation occurred between Assistant State's Attorney Gibbons and Mr. & Mrs. McCloud and Mrs. Kirkman. While Assistant State's Attorney Gibbons was talking to the McClouds and Mrs. Kirk-

man, he requested that they testify before the Grand Jury about their knowledge concerning William Kirkman's involvement in Harriet Price's death. Mrs. Kirkman then asked if their testimony would help the defendant with an insanity plea, to which Assistant State's Attorney Gibbons replied, 'It sounds like he needs help.' Nothing further was said and no promises were made regarding efforts to get psychiatric help for the defendant."

It is significant that the prosecutor had not served or caused subpoenas to be served on the McClouds and Mrs. Kirkman to command their presence and testimony before the grand jury. It is also significant that police officers went to Mrs. Kirkman's residence and transported her and the McClouds to Assistant State's Attorney Gibbons' office. It is likewise meaningful, insofar as the record before us reveals, that Mrs. Kirkman and the McClouds were the only testimonial sources from which the prosecutor could obtain an indictment against the defendant or thereafter secure his conviction thereon.

According to the State's memorandum in opposition to the defendant's motion to quash the indictment and suppress, the prosecutor merely *requested* Mrs. Kirkman and the McClouds to testify before the grand jury to return a murder indictment against her son, Marcia's brother and Glen's brother-in-law. Mrs. Kirkman then asked the prosecutor "if their testimony [before the grand jury] would help the defendant with an insanity plea." The prosecutor simply responded, "It sounds like he needs help." Without deciding whether the prosecutor was under an obligation to explain to Mrs. Kirkman or the McClouds their rights; without deciding whether the prosecutor had a duty to explain the defendant's rights to them; and it need not be decided whether the prosecutor was compelled to advise Mrs. Kirkman and the McClouds that they were the prosecutor's only source for obtaining an indictment against the defendant, or, that based upon their testimony before the grand jury a murder indictment would or could be returned against their son and brother. It cannot be honorably disputed, however, that the prosecutor, the legal representative of the State, was at least obligated to directly answer Mrs. Kirkman's question and to answer it truthfully. The prosecutor did neither. It cannot be reputably debated that once Mrs. Kirkman asked the question, the prosecutor was then under a duty to at least not mislead her and not allow her to testify before the grand jury through her ignorance, misapprehension, misinterpretation or misinformation. Certainly the prosecutor should not have, by adroit cosmetic deceptive acquiescence in their concerns for the defendant, misled Mrs. Kirkman

and the McClouds and violated the trust they had reposed in him, or allowed them to mistakenly place their confidence in him. The role of government in our society is an omnipotent one. That role should always be executed and fulfilled with honor and honesty, truthfully and fairly. By the State's admission it was not so performed by the prosecutor in the case at bar.

The defendant filed a response to the State's memorandum in opposition to the defendant's motion to quash the indictment and suppress. The defendant urged in his response that "the State concedes that they are bound by a promise made to a defendant or his attorney. They contend, however, that they are not bound in the instant situation because the promise was made to defendant's family." Firstly, defendant maintains that he was denied due process by the abuse and misuse of the grand jury, by the State's Attorney in falsely inducing family members to testify before the grand jury. Secondly, he maintains that the promises made to family members in the instant case were even more prejudicial to defendant than promises made to a lawyer because the State's promises falsely induced family members not to seek a lawyer for defendant.

The trial court held an evidentiary hearing on the defendant's motion to quash the indictment and suppress. The defendant called Mrs. Veronica Kirkman as a witness. She testified that she was married to the defendant's father and was his stepmother. She related that on January 17, 1984, she came to the criminal court building with her husband—the defendant's father—and her two sons. She stated that upon her arrival she saw William Kirkman's mother, Mrs. Deloyce Kirkman, the defendant's sister, Mrs. Marcia McCloud, and the defendant's brother-in-law, Glen McCloud. She further testified:

"Q. Were you in the presence of an assistant State's Attorney that day?

A. Just before they went into the grand jury.

Q. And while you were in his presence, did you hear a conversation that was said?

A. Yes, I did.

Q. *** Tell the court what people were speaking?

A. Yes. Deloyce Kirkman asked the attorney that by her giving, you know, talking to them, would it help her son get an insanity plea.

Q. Did you hear what the attorney said?

A. He said, 'It sounds like he needs help.'

Q. What else did the attorney say?

A. Well, that was about the extent of the conversation as

far as getting psychiatric treatment, he said it sounds like—

[Assistant State's Attorney]: Objection, motion to strike all that was said after she said that that was all that was said. The rest is volunteered.

THE COURT: Sustained.

[Defense Attorney]: Judge, she said that that was about all that was said, and she was about to tell us more.

THE COURT: Well, the question was answered. If you have another question, you may ask it."

Mrs. Veronica Kirkman further related on direct examination that after the assistant State's Attorney made the statement, Glen McCloud and then Deloyce Kirkman and Marcia McCloud were called before the grand jury. She additionally testified on direct examination:

"Q. Did the State's Attorney say anything with respect to what charge he was trying to get?

\* \* \*

A. He said, just like I say, 'It sounds like he needs help,' and they would try to get him some help if he needed it.

THE COURT: I didn't hear the last, you said it sounded like what?

A. It sounded like the type of case that sounded like he needed help."

On cross-examination by the prosecutor Mrs. Veronica Kirkman testified:

"Q. The State's Attorney didn't use the word [insanity]? Did he?

A. Well, he did say that it sounded like William needed help.

Q. That is all he said, according to you, right?

A. And that he might be able to get a plea for insanity, yes. Now that is what I heard.

\* \* \*

Q. \*\*\* When you say you were there, in front of other people \*\*\* what plea were they talking about?

A. They were talking about an insanity plea.

\* \* \*

Q. Are you testifying that a State's Attorney said William can plead insanity?

A. No. His mother asked could he get a plea, would the testimony that they gave, would it help him get a plea for insanity, and he said, 'Yes, it should help him get a plea to insanity because it seems like he needs help.' "

Marcia McCloud was also called as a witness by the defendant on the hearing of the defendant's motion to quash the indictment and suppress. She related that the defendant was her brother and that on January 17, 1984, she came to the criminal court building with her mother, Mrs. Deloyce Kirkman, her husband, Glen McCloud and her stepmother, Veronica Mosley, and a stepbrother. Marcia McCloud further related on direct examination:

"Q. Now, when you got down here, what happened?

A. Well, I was talking to my mother, I says, 'We are going to see the prosecutor and I think we should be talking to my brother's attorney.' And she says, 'Well, he [the prosecutor] says, he called us in, one at a time, and he told me, well, he told me first, that this is the way to get your brother some help, evidently, he needs help, the crime he committed and the way it was done.'

* * *

Q. When he told this to you, was anybody else in the room besides you and him?

A. Yes.

Q. Who was in the room?

A. Well, it was my husband, and mother, and myself, and my father, and my stepmother was sitting right outside the office.

Q. After he said this to you about the help, did you testify before the grand jury?

A. Yes.

Q. If he had not said that to you, would you have testified before the grand jury?

* * *

A. No."

On cross-examination by the prosecutor, Marcia McCloud testified:

"Q. The State's Attorney at the grand jury that day said it sounds like your brother needs help?

A. Yes.

Q. Now, did he mention any kind of plea?

A. Insanity, he told us that is the way to get him out.

Q. Well, what exactly did he say to you?

A. He told me, 'It sounds like your brother needs help and this is the way to get him help. We can talk to his attorney. After going into the grand jury, we will set up where he sees a doctor.'

* * *

Q. Did he say anything about a defense lawyer going along with his opinion?

A. Yes.

Q. What was that?

A. Said that he would talk to his lawyer about him seeing a doctor.

\* \* \*

Q. And after you had that conversation with the State's Attorney, you went in and spoke in front of the grand jury, isn't that correct?

A. Yes."

The defendant's mother, Mrs. Deloyce Kirkman, was called as a defense witness on the hearing of the defendant's motion to quash the indictment and suppress. She testified that she came to the criminal court building on January 17, 1984, with her daughter and son-in-law, Marcia and Glen McCloud. She further related on direct-examination:

"Q. When you got down here, did you talk to the State's Attorney?

A. Yes.

Q. When you talked to the State's Attorney, what happened?

A. He asked me all the questions he wanted to ask me, then I asked him if I could ask him some questions and he said yes. And I asked him could my daughter and son-in-law remain in there with me, he said yes. And I asked him, I was telling the state of mind that my son was in, William Kirkman, and he told me that we had to go and testify before the grand jury. He could get some subpoenas and then force us to do it, but it would save him time and trouble if we agreed to do it and that would be the only way I could get the help I was asking for, for my son.

Q. What kind of help were you asking him for?

A. I told him the state of mind he had been in and I was trying to help get psychiatric help for him.

Q. And he told you the only way you could get psychiatric help was if you testified before the grand jury?

A. Yes. And he said that he would see that he got that help real soon because as soon as they appointed him an attorney, he would talk to the attorney about having a mental hearing."

Mrs. Deloyce Kirkman expounded further on cross-examination by the prosecutor that she knew when she came to the criminal court building to talk to the prosecutor that her son was charged with mur-

der and that she did not want to talk to the prosecutor. When asked how it happened that she went to the prosecutor's office that morning, she responded, "The detective told us down there, that Sunday that they were going to have someone pick us up at 8:30 in the morning to bring us down here to talk to the State's Attorney, me, my daughter and son-in-law." Mrs. Kirkman stated that she went with the police to the prosecutor's office to speak with him. When she spoke with the prosecutor she first answered his questions and then she asked the prosecutor if she could ask him some questions. The prosecutor asked her questions about what had happened and she told him as best she knew. She did not volunteer any information because she realized that the prosecutor was not her son's attorney. She asked the prosecutor about insanity and told him how many times she had called the police and how she had been trying to get help for her son. The prosecutor told her more than once that her son "would probably be tried for insanity." The prosecutor sat and listened when she told him about the problems her son was having and then he told her, "I will have no objection to, as soon as they appoint him an attorney, I have no objection. I will recommend that he be tried for insanity." The prosecutor assured Mrs. Kirkman that he would recommend insanity to her son's attorney as soon as they appointed him one and that her son would get an attorney sooner if they went before the grand jury voluntarily and which was why they agreed to go in and testify before the grand jury. The prosecutor said that he would not create any problem with her son's attorney and an insanity plea. Mrs. Kirkman further testified on cross-examination:

"Q. Now, what kind of problems were you telling the State's Attorney that your son had?

A. I was telling him, that for that entire week, police had—

* * *

Q. They were about mental problems, isn't that correct?

A. Yes.

Q. About behavior problems?

A. Yes.

* * *

I told him I had been seeking help for him.

Q. Did the State's Attorney tell you that it sounded like he needs help; yes or no?

A. No, he said he would have no objection for him being tried for insanity. That is what he said.

* * *

Q. Did you understand what a trial for insanity meant?

A. The only thing I understood was that he would be getting help for the problems that he had.

Q. Are you telling this court *** you went in and talked to the grand jury anyway?

A. [Yes], because I made the statement to the State's Attorney: I understand that he had committed a crime, it wasn't that I was asking that he not pay; I was asking for him to have help that he needed."

Mrs. Kirkman then related that the State's Attorney agreed with her that her son needed help and told them that he could subpoena them but it would be easier if they went in and talked to the grand jury on their own accord. She, her daughter and son-in-law went in and testified before the grand jury after the prosecutor promised them that he would see that her son would get the help he needed. She took the prosecutor at his word and that is the only reason she went before the grand jury. The prosecutor told her that that was the only way her son would get the help he needed—for her, her daughter and son-in-law to testify before the grand jury.

Assistant State's Attorney Thomas Gibbons testified on behalf of the State at the hearing of the defendant's motion to quash the indictment and suppress. Gibbons testified that in January 1984, he was assigned to Branch 66, a homicide-sex preliminary hearing court; that his duties were "to indict cases that were coming in the system that day" and that the William Kirkman case was assigned to him "for indictment." Regarding the William Kirkman case, Gibbons stated that he interviewed the defendant's mother, Mrs. Deloyce Kirkman, the defendant's sister, Marcia McCloud, and the defendant's brother-in-law, Glen McCloud, and the detective assigned to the case, Patrick Chambers, and that the interviews were held in the State's Attorney's office in Branch 66 on the fourth floor of the criminal court building across from the grand jury room. Gibbons stated that during his interview with the defendant's mother, his sister and his brother-in-law, he did not make any promises concerning Kirkman's case and that he did not "make any representation to them concerning the sanity of the defendant or the psychological well-being of the defendant." Gibbons further testified on direct-examination, however:

"Q. *Did Mrs. Kirkman*, specifically, Mr. Gibbons, did she *ever ask you if the defendant could plea to insanity?*

A. *Yes, she did.*

Q. And who was present when Mrs. Kirkman asked you if the defendant could plead guilty to insanity?

A. I believe that Glen McCloud, Marsha McCloud and De-

tective Chambers were present.

Q. How did you respond when she asked you if the defendant would be allowed to plead guilty to insanity?

A. *Mrs. McCloud asked me if her son could plead guilty to insanity and get some help, that he needed help.* I told her that what his defense would be was up to his lawyer. I had already explained to her I was an assistant State's Attorney. I was a prosecutor, and that I was assigned to prosecute the case. I had already told her that I was not her son's lawyer.

*When she asked me about could he plead guilty to insanity,* I told her that whatever his defense would be would be up to his lawyer. *Although I did tell her it sounded like he needed help.*" (Emphasis added.)

Assistant State's Attorney Gibbons testified on cross-examination:

"Q. Now, when Mrs. Kirkman asked you about a plea to insanity, that was inside your office?

A. Yes.

Q. And that was before she testified before the Grand Jury?

A. Yes.

Q. And when you told her it sounded like the defendant needed help, that was before she testified before the Grand Jury?

A. Yes.

\* \* \*

Q. Now, just before the first person went into the Grand Jury room, did you tell them where you were going?

\* \* \*

A. Well, I knew they were going to testify in front of the Grand Jury. I told them we were going to walk across the hall which was between my office and the Grand Jury, and then I was going to be presenting evidence to the Grand Jury. So they knew I was going into the Grand Jury room."

In summarizing the evidence and arguing the defendant's motion to quash the indictment and suppress, the defendant's attorney pointed out to the trial court that Mrs. Deloyce Kirkman testified that she asked the assistant State's Attorney "would it help her son to get an insanity plea if she testified before the grand jury," and that the assistant State's Attorney responded, "[i]t looks like he needs help." The defendant's attorney argued further that, "Mrs. Deloyce Kirkman testified that when the State's Attorney made those representations to her, that she then agreed to testify before the grand jury." The defendant's attorney additionally urged that, "We are looking at peo-

ple who are not lawyers ***. What we are dealing with is the understanding, the impression that these people got from the representations that were made by the assistant State's Attorney when they talked to him. Those representations induced these witnesses to go before the grand jury and to give testimony."

The defendant's attorney concluded his argument, "that to use these relatives to induce them to go in and give testimony as opposed to instructing them that they have a right to go out and get a lawyer for their son and for their brother represented a misuse of the grand jury, denied the defendant due process."

Based on the defendant's motions to "Quash the Indictment," to "Compel Compliance With A Promise," to "Quash Grand Jury Proceedings and to Exclude Testimony," the affidavits of the defendant's mother, sister and brother-in-law in support thereof, the testimony of the witnesses on the evidentiary hearing of the motions and the arguments of counsel, the trial court was inherently called upon to decide whether the grand jury witnesses, the defendant's mother, his sister and his brother-in-law, knowingly, willingly, voluntarily, intelligently and purposefully cooperated with the prosecuting attorney to criminally prosecute and ultimately penally imprison their son, brother and brother-in-law, or, whether they testified before the grand jury because of their understanding of the prosecutor's promises to them that only by their so doing could the defendant plead insanity and receive needed psychiatric treatment. On the evidence presented at the hearing, it would appear difficult, to say the least, to conclude that the grand jury witnesses knowingly cooperated with the prosecutor to successfully criminally prosecute and imprison their son and brother. The trial court clearly recognized that unfeasible aspect of this dilemma. In denying the defendant's motions, the trial court concluded and ruled:

"Well, on the hearing of this motion, we have the members of the defendant's family who testified that they were—that they testified before the Grand Jury as a result of a conversation that they had with the Assistant State's Attorney. It all involves the issue of sanity or lack of sanity in connection with the defendant. And the Assistant State's Attorney has testified that the conversation was different than what the family members say it was.

They were all here on the day in question because they were interested in getting the best possible official procedures invoked to deal with what they percieve[d] the defendant's condition to be. And it appears that the conversation was probably

brought about more by their questions than by anything else.

*But the Court does not believe that there were any statements WILFULLY made by the Assistant State's Attorney to persuade the family members to testify before the Grand Jury in order to obtain an indictment. It appears from the known facts that that would not have been necessary to do such a thing,* and that the Assistant State's Attorney was probably evidently trying to be helpful rather than harmful in answering the questions raised by a concerned family concerning the defendant in this case." (Emphasis added.)

This ruling, denying the defendant's motion to quash the indictment, has not been assigned as error, briefed or argued by the defendant's attorney on this appeal. It is clear to me that the defendant's motion to quash the indictment and the trial court's expressed basis for its denial thereof at least merited assignment as error and argument as a ground for reversal on this appeal.

## IA

It also appears that the trial court may have resorted to several improper criteria in denying the motion to quash and suppress. First, the question was not whether the prosecutor *wilfully* made statements to the defendant's family to persuade them to testify before the grand jury. For the trial court to deny the motion based on its conclusion that the prosecutor did not *wilfully* do so may have been, it seems, erroneous. If the prosecutor did not *wilfully* make a statement to the defendant's family to persuade them to testify before the grand jury, but *unwilfully* made such statements which in fact induced the defendant's family to testify before the grand jury, when they would not otherwise have voluntarily done so, it would seem that the indictment's validity may have been questionable and may have merited the indictment being quashed.

Second, it appears that the trial court sought to rely on a middle ground as its basis for denying the motion to quash the indictment and suppress. Based on the testimony before the trial court, there doesn't appear that there was a middle ground available to it. The defendant's mother, his sister, his brother-in-law and his stepmother all unequivocally stated that they testified before the grand jury because of the prosecutor's assurances to them that only by their so doing could the defendant plead insanity and receive needed psychiatric treatment. There is not one iota of contrary evidence contained in the entire record which suggests that they were knowingly and purposefully cooperating with the prosecutor to criminally prosecute, convict

and criminally imprison their family member. The prosecutor denied that he made any promises to the defendant's relatives. The prosecutor admitted however that, in response to the defendant's mother's inquiry if the defendant could plead insanity, he told her that "[i]t sounded like he needed help." From the evidence presented, either the prosecutor represented to the defendant's relatives that only by their testifying before the grand jury could the defendant plead insanity and obtain needed psychiatric treatment, and in reliance on the prosecutor's representations they testified before the grand jury, as the defendant's relatives testified on the hearing of the motion to quash and suppress; or, the prosecutor did not make such representations to the defendant's relatives, as the prosecutor testified on the hearing. From the testimony presented there was no middle ground of "statements *wilfully* made by the assistant State's Attorney to persuade the family members to testify before the grand jury in order to obtain an indictment." Moreover, it is noteworthy that from what appears in the record before us, but for the testimony of the defendant's family members, the prosecutor may not have had the evidence available to him to obtain an indictment against the defendant.

Thus, and third, it seems that the trial court's conclusions, that *"[i]t appears from the known facts that that would not be necessary [for the prosecutor] to do such a thing,* and that the assistant State's Attorney was probably evidently trying to be helpful rather than harmful in answering the questions raised by a concerned family concerning the defendant in this case," are not only unwarranted but are also clearly contrary to the facts in the record before us.

From the foregoing there are presented the viable issues of whether the trial court's stated grounds for and its denial of the defendant's motion to quash the indictment and suppress were correct. These issues, however, have not been assigned by the defendant's appellate attorney as a ground for this court's reversal of the defendant's conviction. While I agree with the majority's conclusion that the State has not had an opportunity to meet these issues on appeal and this court should not resolve them *sua sponte*, I do not agree with the majority's implied suggestion that they should be resolved only in a *"full hearing"* collateral post-conviction proceeding. (Ill. Rev. Stat. 1985, ch. 38, par. 122—1.) A *full hearing* on these issues has already been held by the trial court and the complete pleadings of the parties, all the testimony presented by the parties in support of and in opposition to the issues on the hearing, the total arguments of counsel, the trial court's full ruling thereon, and the defendant's post-trial motions which preserved the issues are all a part of the record

on appeal before us. Therefore, this court should direct the defendant's court-appointed attorney and the State to brief and argue these foregoing crucial issues and after oral argument by them thereon, this court should decide these issues. 107 Ill. 2d Rules 615(a), (b).

## II

The record on appeal before us also presents the equally viable issue of whether the circumstances of the appearances and the testimony of the defendant's mother, sister and brother-in-law before the grand jury and the trial court's denial of the defendant's motion to quash the indictment and suppress violated the parent-child privileged communication. This vital issue was not raised by the defendant's attorney in the trial court and it has not been raised by the defendant's appellate attorney in this court.

The parent-child privileged communication was presented in *In re Application of A & M* (1978), 61 A.D. 2d 416, 428, 403 N.Y.S.2d 375, 377. The issue before the court was "whether the State *** may compel the parents of a minor child to testify before a grand jury concerning admissions by the child which were made in confidence. This issue is, we believe, one of first impression in this State." The parents had been subpoenaed to testify before the grand jury to their son's admission to them regarding alleged arsons. The trial court granted the parents' motion to quash the subpoena on the ground that the constitutional right of privacy protected the confidential *intrafamilial* communications. The appellate court agreed that certain parent-child communications are protected by the constitutional right of privacy but reversed because the circumstances of the parent-child communications were not revealed in the record and remanded with direction to the trial court to exclude those parent-child communications made by the minor child within the context of the family relationship to obtain support, advice or guidance. On appeal the State "urged that the [trial] court was in error in finding that the Constitution confers a right of family privacy." The appellate court responded, "That position fails to consider a host of cases which have given constitutional dimension to matters concerning the relational interests of parents and children and which acknowledge a 'private realm of family life which the state cannot enter.' " (*In re Application of A & M*, 61 A.D. 2d at 429-30, 403 N.Y.S.2d at 378, quoting *Prince v. Massachusetts* (1944), 321 U.S. 158, 166, 88 L. Ed. 645, 652, 64 S. Ct. 438, 442.) The appellate court further responded, "Although the several opinions in *Griswold [v. Connecticut* (1965), 381 U.S. 479, 14 L. Ed. 2d 510, 85 S. Ct. 1678,] disclose a divergence of philosophy as to the source of this

right, the court articulated for the first time a fundamental right of privacy of constitutional dimension and signaled the willingness of the court to prevent encroachment by the State into certain enclaves of private life." (*In re Application of A & M*, 61 A.D. 2d at 430, 403 N.Y.S.2d at 379.) After concluding that "the integrity of family relational interests is clearly entitled to constitutional protection," the court persuasively stated:

> "Surely the thought of the State forcing a mother and father to reveal their child's alleged misdeeds, as confessed to them in private, to provide the basis for criminal charges is shocking to our sense of decency, fairness and propriety. It is inconsistent with the way of life we cherish and guard so carefully and raises the spector of a regime which encourages betrayal of one's offspring." *In re Application of A & M*, 61 A.D.2d at 433, 403 N.Y.S.2d at 380.

In *People v. Fitzgerald* (1979), 101 Misc. 2d 712, 422 N.Y.S.2d 309, the father, under subpoena, testified before the grand jury as to his 23-year-old son's admissions to him that he was involved in a fatal hit-and-run automobile accident. Thereafter the father made a motion to preclude his trial testimony of his son's admissions to him on the ground that the child's admissions were "parent-child privileged." The court pointed out, "The issue of first impression before this court is whether there exists a 'parent-child' privilege which would prevent forced disclosure by the State of confidential communication between a parent and a child of any age." The court concluded that, "In the opinion of this court such a privilege can and does exist, grounded in law, logic, morality and ethics" (101 Misc. 2d at 713, 422 N.Y.S.2d at 310), and further stated:

> "Confidential communications, by their very nature, in order to foster the ongoing confidential parent-child communications between parent and child, must remain confidential and private if the parties so desire, and be without the power of the State to inquire.
>
> * * *
>
> *** [T]his Court holds that a parent-child privilege does exist in this State, flowing directly from such rights as are granted by both the Federal and New York State Constitutions, U.S. Const., Amendments 9 and 14, New York State Constitution, Art. 1, Section 1 and 6, which have fostered the recognition of what has come to be known as the 'right to privacy.'
>
> *** [T]here is no longer room for doubt but that such a right is one of Federal constitutional dimensions and may not

be abridged by the State." 101 Misc. 2d at 714-15, 422 N.Y.S.2d at 312-13.

In *In re Agosto* (D. Nev. 1983), 553 F. Supp. 1298, Charles Agosto, in reliance on the parent-child privilege, moved to quash a grand jury subpoena to relieve him from being coerced to testify against his father, not only as to confidential communications but also as to any other matters adverse to his father in any criminal proceeding. The court pointed out that "the law in this area is relatively undeveloped at the present time" and that "the issue *sub judice* is a new frontier in the area of testimonial privilege, and *** an evolving point of law of significant gravity." (553 F. Supp. at 1300.) After an exhaustive review of the authorities and a scholarly dissertation, the court concluded in *Agosto*:

> "The parent-child privilege, then, is based not only on the confidential nature of specific communications between parent and child, but also upon the privacy which is a constitutionally protectable interest of the family in American society.
>
> ***
>
> *** While societies and even systems of government evolve throughout the ages, the family unit, as a repository of society's more important values, remains timeless in its function within each society and political structure. The importance of maintaining the integrity of that function is inestimable. *** The practical effect of allowing the government to coerce testimony by parent and child against one another is that individuals totally uninvolved in and innocent of the alleged wrongdoing will be jailed for contempt, solely because of a strong sense of family loyalty. The government, then, is essentially in a position of actively punishing selflessness and loyalty which are inculcated into the child by family, church, and even the state itself. It is inconsistent with a free society to place a child in the position of choosing between loyalty to his parent and loyalty to his state. *** [S]ome guilty family members may 'slip through,' but the integrity of the family unit must be maintained, even at that cost." (*In re Agosto*, 553 F. Supp. at 1325-27.)

Thus, the court in *Agosto* held that parenthood is supreme to statehood.

In *People v. Harrell* (1982), 87 A.D.2d 21, 450 N.Y.S.2d 502, the court held that motherhood is superior to statehood and ruled that a statement by a child made under arrest in a police station to his mother which was overheard by police officers was a parent-child

privileged communication. Parenthood was in effect held superior to statehood when the court held that a child's statement to his grandmother was a parent-child privileged communication in *In re Ryan* (1984), 123 Misc. 2d 854, 474 N.Y.S.2d 931. See Annot., *"Testimonial Privilege For Confidential Communications Between Relatives Other Than Husband And Wife—State Cases"* 6 A.L.R.4th 544 (1981); Note, *Questioning the Recognition of a Parent-Child Testimonial Privilege*, 45 Alb. L. Rev. 142 (1980).

In *United States v. Davies* (1985), 768 F.2d 893, the defendant relied on an alleged violation of the parent-child privilege for reversal of his theft conviction. The court rejected the contention and declined to follow *In re Agosto* (1983), 553 F. Supp. 1298. *Davies*, however, did not involve an attempt by the State to compel a parent's testimony of a child's incriminating admission to the parent of the child's commission of a crime. Rather, *Davies* simply involved a child's verbal revelation of the father's telephone number to a law enforcement officer during the agent's investigation and prearrest of the child's father. While investigating a jewel theft, the FBI agents in *Davies* identified themselves to a teenage girl that they observed leaving a building which the agents had under surveillance. The girl told the agents that she was the daughter of the defendant, who was a suspect in the jewelry theft. The girl also gave the agents a telephone number which her father had given her. Based on this information the agents began a surveillance at the premises where the telephone was located. The defendant and codefendant were seen in the premises, and the stolen jewelry in its original display cases with the defendant's fingerprints thereon was discovered by the agents in an automobile the agents had seen the codefendant drive and park in front of the premises. The defendant sought to suppress the evidence developed from the agents' obtaining the telephone number from the defendant's daughter on the ground that his communication of his telephone number to his daughter was a parent-child privileged communication. In rejecting this contention the court pointed out that the parent-child privilege applied "only to prevent the use of testimony in a judicial proceeding," and because the defendant made "no assertion that the government even intended to call his daughter at the trial[,]; his assertions of privilege are based solely on her questioning during the investigation. Thus neither this phone number nor any other evidence obtained through this critical investigation lead are subject to suppression by the district court." *United States v. Davies*, 768 F.2d at 900.

## IIA

This extremely important constitutional issue of the right of privacy and the attendant integral parent-child privilege were not raised in the trial court. The defendant's appellate attorney has likewise failed to raise this crucial issue before this court, on this the defendant's first appeal as of right. The question is therefore presented whether the defendant has been thereby denied his constitutional right to the effective assistance of counsel in this court (as well as in the trial court).

The Supreme Court held that the due process clause of the fourteenth amendment guaranteed the criminally convicted defendant the effective assistance of counsel on his first appeal of right in *Evitts v. Lucey* (1985), 469 U.S. 387, 83 L. Ed. 2d 821, 105 S. Ct. 830.

Just as the defendant's trial attorney failed to invoke the defendant's constitutional right of privacy in the case at bar, the defendant's attorney similarly neglected to invoke the defendant's constitutional right to be secure in his home against unreasonable search and seizure in *Kimmelman v. Morrison* (1986), 477 U.S. 365, 91 L. Ed. 2d 305, 106 S. Ct. 2574. When at trial the prosecutor offered into evidence a sheet seized from the defendant's bed, on which he allegedly committed the rape for which he was on trial, and other corroborating incriminating scientific evidence derived from the bed sheet, the defendant's attorney in *Kimmelman* then sought for the first time to present a motion to suppress the sheet and its derivative evidence on the ground that it was seized in violation of the defendant's fourth amendment constitutional right to be secure in his home against unreasonable search and seizure. The defendant's attorney contended, *inter alia*, that he had no prior knowledge of the seizure of the sheet. The trial court took the position that the defendant's attorney would have acquired knowledge of the seizure had he properly sought pretrial discovery, which he neglected to do. The trial court refused to entertain the suppression motion on the ground that it was untimely presented. The Supreme Court held that the defendant's attorney's failure to conduct pretrial discovery and his attendant failure to timely file the motion to suppress denied the defendant the effective assistance of counsel to which the defendant was constitutionally entitled. The Supreme Court affirmed the judgment of the court of appeals, which vacated the defendant's rape conviction and sentence and remandment to the district court to consider whether, under the standards set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the defendant had been prejudiced by his attorney's ineffective assistance.

In *Strickland,* the Supreme Court held that ineffective assistance of counsel is established when it is shown that counsel's representation fell below an objective standard of reasonableness considering all the circumstances; that a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are claimed not to have been the result of reasonable professional judgment, and that, although it need not be shown that counsel's deficient conduct more likely than not altered the outcome in the case, nevertheless, it must be shown that the attorney's particular unreasonable errors actually had an adverse effect on the defense, that the deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance of counsel under the constitution.

### III

In the case at bar, regarding identification of the acts or omissions of counsel that may be considered to have been the result of unreasonable professional judgment, in addition to those previously mentioned herein, which may have had an adverse effect on the defense and which could be demonstrative of counsel's deficient performance prejudicial to the defense under *Strickland,* it appears from the record before us, as previously noted, that the only trial evidence available to the prosecutor to prove the murder allegation against the defendant was the testimony of the defendant's mother, sister and brother-in-law of the defendant's admission to them of his commission of the homicide, to which they had testified before the grand jury. The defendant's attorney presented to the trial court the defendant's motion entitled "Motion to Quash Grand Jury Proceedings and to Exclude Testimony." The motion stated, "Now comes defendant and moves this Honorable Court to dismiss the indictment in the instant cause and *to preclude the State from using testimony presented by any witness who appeared before the grand jury in this cause."* (Emphasis added.) The motion prayed "that this Honorable Court quash the grand jury proceedings and *exclude the testimony of all witnesses appearing before the grand jury."* (Emphasis added.)

On the evidentiary hearing of and in support of the motions, the defendant's attorney called the defendant's mother, sister, brother-in-law and stepmother as witnesses, who testified to the circumstances surrounding their appearance and testimony before the grand jury. At the conclusion of the evidentiary hearing, the defendant's attorney vehemently argued for allowance of the motions. The trial court denied the motions. Having unsuccessfully sought to exclude the grand jury witnesses as trial witnesses and their grand jury testimony as trial ev-

idence, the defendant's attorney, later, at trial inexplicably stipulated to the admission of the grand jury testimony of the defendant's mother, sister and brother-in-law as trial evidence against the defendant. If there was or is any valid explanation or justification for this unusual trial tactic, it is not to be found in the record before us.

The prosecutor adroitly elicited from the grand jury witnesses the bare minimum testimony necessary to obtain a murder indictment against the defendant. The prosecutor did not attempt to question or cross-examine the witnesses before the grand jury to bring forth any information beneficial to the defendant even though the witnesses had clearly informed the prosecutor prior to their grand jury appearances that they believed the defendant suffered from a mental illness, which they also believed was a factor in the commission of the homicide. No effort was made by the prosecutor to present any facts to the grand jury from the grand jury witnesses upon which the witnesses predicated their belief that the defendant was mentally ill. No details of the commission of the homicide helpful to the defendant were evoked by the prosecutor from the grand jury witnesses. Under these circumstances, by stipulating to the admission of the witnesses' grand jury testimony as substantive trial evidence against the defendant, the defendant was deprived of the benefit of confrontation and cross-examination helpful to his defense. More importantly, it appears that only by this stipulation was the prosecutor able to establish a case against the defendant.

These before-mentioned issues have not been assigned, briefed or argued as error for reversal by this court. It seems from the foregoing that the defendant may not have received in the trial court or in this court that zealous effective assistance of counsel to which he is constitutionally entitled.

## IV

It was uncontradicted that the defendant's mother, sister and brother-in-law told the prosecutor that they believed the defendant had a mental problem. The prosecutor admitted that the defendant's mother asked him if the defendant could plead insanity. The prosecutor admitted further that in response to her question he told the defendant's mother that, "It sounded like he needed help." According to these relatives of the defendant, they testified before the grand jury because of the prosecutor's assurances to them that only by their so doing could the defendant plead insanity and receive the needed mental treatment.

Glen McCloud, the defendant's brother-in-law, testified before the

grand jury that the defendant told him that Harriet Price, the deceased, had come to the defendant's mother's apartment, where the defendant was temporarily living, and that the defendant further said:

> "Harriet came up there hollering at him, talking about him and then the next thing he knew, she asked for a glass of water. And he told her to get it herself.
>
> He said while she was in the kitchen getting the water, he was looking out the window, had his head hanging out the window. And he said he heard her come back in the room hollering at him, talking about him. And then she was also stabbing at him with a knife. He said he grabbed her by the neck with his arm like that and then she was steady talking about him and hollering at him. The next thing he knows, he had grabbed her, had put his hand around her throat. And he said before he realized it, she had her knees buckled and she had went to the floor. And he said he put his head on it and cried for a minute and that's when he realized she was dead.
>
> A JUROR: Had he had those kind of violent arguments before, you know? Was she teasing him when she was, you know, saying these things to him or, you know, did she often say these kinds of things to him?
>
> A. I don't really know. Well, they had been into it all week. They had been fighting all week.
>
> * * *
>
> A JUROR: Was she trying to kill him?
>
> A. I don't know. I don't know. He said that she was stabbing at him."

McCloud further related to the grand jury that the defendant told him that he had concealed Price's body in a laundry bag under the building stairs; that he told the defendant's mother what the defendant had told him that from a cursory search of the stair area with a flashlight they did not see the body.

Mrs. Deloyce Kirkman, the defendant's mother, testified before the grand jury that as she was getting dressed for her work as a barmaid in the tavern on the first floor of the building where she lived:

> "I looked around and he was sitting there with his head down and I started talking to him. And *he said, started talking all crazy.* And I said, what's the matter with you? And he said, well I am just—he said, I want to talk to you, but you are running late. (Emphasis added.)"

Mrs. Kirkman also testified that she went to work, and further:

> "Q. Well, when your daughter came down to the bar, did she

tell you something?

A. She told me, she said, your son is back upstairs. I said, he is? And she said, he's up there talking a lot of crazy stuff to Mack. She calls her husband Mack. And *I said, Mack is going to let him drive him as crazy as he is.*'' (Emphasis added.)

Mrs. Kirkman further related to the grand jury that she talked to her son-in-law, Glen McCloud, after she talked to her daughter and that she and her son-in-law again looked for and found Price's body in the stair area where the defendant had said he placed it. Mrs. Kirkman additionally testified:

"A JUROR: Was your son known to get in trouble or did he have a violent temper?

A. He had a temper and *I begged the police Friday night to put him in jail until I could have him committed.*

A JUROR: So, he's been in trouble before?

A. Yes, he had almost—I called his parole officer about a month or so ago and he had almost killed his sister. He choked my daughter. And *he was so mentally unbalanced we couldn't do nothing with him.* And I told his parole officer he was running around and we couldn't do nothing with him. And we were afraid of him.

\* \* \*

A JUROR: Do you know if when they were arguing, do you know if Harriet was—when she was trying to stab him, was she trying to hurt him or stop him from hurting her?

A. He told me—he told me that that downstairs door was open. And when she came in and she came up and knocked on the door and he said, come in. And he said, when she realized there was nobody there but him, he said she started arguing. He said she told him he called her sister a lot of bad names and he said, get away from me. I don't want to hear that garbage. She asked him for some water. And he told her to go get it herself. Then she came back with a knife. And he said she told him she was going to kill him. He said she started stabbing at him and said—she said to him, she was laughing and said, you was never no man, lot of things she said. He said he started crying and said she was laughing so and he said after that he don't remember what happened.

\* \* \*

A JUROR: *Did Harriet know his condition?*

A. *Yes,* she had said she was coming over and talk to me because *she didn't want me to have him committed to no hospi-*

*tal. She said they had talked and he had agreed to get help hisself."* (Emphasis added.)

Marcia McCloud, the defendant's sister, testified before the grand jury that she was present and overheard the defendant tell her husband, Glen McCloud, that he had killed Price. She further related:

"Q. Can you tell us what he said to your husband, what your husband said?

A. Well, I wasn't there in the same room. I was in the kitchen. And my husband came back and told me. He said, your brother said he's killed Harriet and her body is downstairs. I told him, *Don't listen to him. He's always talking crazy."* (Emphasis added.)

Officer Patrick Chambers testified before the grand jury that Price's body was recovered from the stairwell leading to the basement of the building in which the Kirkmans resided and that an autopsy revealed that the cause of death was strangulation, whereupon a juror inquired:

"A JUROR: *If he was on parole and his mother had called to tell them that he would be in violation and they knew that he was a—mentally unstable, violent person, why didn't they come out and pick him up* or didn't they even look into it or something, you know? Why did they just leave him out on the street? They know he's a violent person. He could have hurt other people.

MR. GIBBONS: Unfortunately, you can't lock somebody up. The law says—I understand you can't lock somebody up. You have to have some evidence that they have done something wrong. And merely making a telephone call and saying that somebody is unstable doesn't mean that you can come out and pick him up. * * *. [B]ut it is not really relevant. * * * I ask for a true bill as murder, armed violence, concealment of a homicidal death." (Emphasis added.)

Even though the defendant's mother, sister and brother-in-law had each expressed their opinion of the defendant's mental illness to the prosecutor before their grand jury appearances and had sought by their grand jury appearances and testimony to enable the defendant to plead insanity as a defense to the murder charge and obtain treatment for his illness, and even though each of them expressed in varying fashions before the grand jury, as above set forth, their beliefs that the defendant suffered from a mental illness, the defendant's trial attorney did not pursue the insanity defense at trial and the defendant's appellate attorney has not assigned his failure to have

done so as a ground for reversal before this court.

The record contains a document filed by the defendant's attorney in the cause on March 1, 1984, entitled "Petition For Psychiatric Examination of Defendant," which prayed for the entry of an order "appointing Dr. Alan Rosenwald to conduct a psychiatric examination of defendant herein for the purpose of determining said defendant's mental condition." Attached to the "Petition for Psychiatric Examination of Defendant" is a document entitled "Order," but which has not been signed by a judge and which bears no date. This unsigned order reads as follows:

"IT IS HEREBY ORDERED THAT Dr. Alan Rosenwald of 53 W. Jackson be and hereby is appointed to conduct a psychiatric examination upon the defendant herein *for the purpose of determining said defendant's mental condition* at present and *at the time of the commission of the alleged offense.*

IT IS FURTHER ORDERED THAT the Director of the Cook County Department of Corrections permit the defendant herein to be examined by said doctor during normal working hours on such dates as necessary to complete such examination." (Emphasis added.)

The record contains an order, dated March 16, 1984, and signed by the trial judge, which reads as follows:

"IT IS HEREBY ORDERED *that the Director of the Cook County Department of Corrections admit Dr. Alan Rosenwald of 53 W. Jackson into County Jail for the purpose of conducting an examination of William Kirkman during normal working hours on such dates as necessary to complete said examination.*" (Emphasis added.)

The aforementioned unsigned order provided for the appointment of Dr. Rosenwald to conduct a psychiatric examination of the defendant to determine his mental condition at the time he committed the homicide, whereas the above order which was signed by the trial court did not so provide. More importantly, the record does not reveal that Dr. Rosenwald, or any other doctor, ever conducted a psychiatric examination of the defendant to determine the defendant's mental state at the time he committed the homicide.[2]

---

[2] The "psychiatric report" referred to in the majority opinion is not a psychiatric report, but rather, it is a report of "Lisa Grossman, Ph.D., Staff Psychologist," which, in addition, significantly states:

"[The defendant] exhibits weakness in the area of abstract reasoning as well as a weakness in the area of understanding social judgment and social norms."

It is provided in section 6—2(a) and section 6—2(e) (Ill. Rev. Stat. 1985, ch. 38, pars. 6—2(a), (e)):

> (a) "A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirement of law.
>
> * * *
>
> (e) When the defense of insanity has been presented during the trial, the burden of proof is on the defendant to prove by a preponderance of the evidence that the defendant is not guilty by reason of insanity. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of each of the offenses charged, and, in a jury trial where the insanity defense has been presented, the jury must be instructed that it may not consider whether the defendant has met his burden of proving that he is not guilty by reason of insanity until and unless it has first determined that the State has proven the defendant guilty beyond a reasonable doubt of the offense with which he is charged."

Based on the record before us, defense counsel's failure to pursue the insanity defense in the trial court, at least to the extent of obtaining a psychiatric report of the defendant's mental state at the time the homicide was committed, demonstrates that the defendant may not have received the effective assistance of counsel in the trial court. Because the defendant's appellate attorney has not assigned this failure by his trial attorney as a ground for reversal on appeal, the defendant, likewise, may not have received the effective assistance of counsel in this court to which he is constitutionally entitled.

## IVA

*Strickland* requires that judicial scrutiny of counsel's performance must be highly deferential, because of the ease with which a court may examine counsel's performance after it has proved unsuccessful and conclude that a particular act or omission by counsel was unreasonable. Thus, *Strickland* demands that to fairly assess an attorney's performance it is necessary to make every effort to avoid the distorting effect of hindsight, to reconstruct the circumstances of the attorney's conduct which is claimed to be ineffective assistance, and to assess that conduct from the attorney's perspective at the time of his performance. *Strickland* also dictates that a court indulge a strong presumption that the attorney's performance is within the wide scope

of reasonable professional assistance and might be considered sound trial strategy. The ineffective assistance of counsel in the trial court has not been raised by the defendant's appellate attorney before this court for reversal and ineffective assistance of counsel in this court certainly has not been raised by the defendant's appellate attorney. On the state of the record before us, and without the benefit of briefs and arguments, it would be difficult and perhaps inappropriate to decide the trial and appellate court ineffective assistance of counsel issues. Moreover, the State and the defendant should be afforded the opportunity to fully address these issues, which can be accomplished in a trial court hearing. For these foregoing reasons this cause, at the very minimum, should be remanded to the trial court under *Strickland* and *Kimmelman*, with directions to appoint other counsel for the defendant and conduct a hearing to determine if the defendant was denied the effective assistance of counsel in the trial court and vacate the guilty finding and sentence and grant the defendant a new trial should it find that he was.

## V

But the defendant's judgment of conviction for voluntary manslaughter and the 15 years' imprisonment sentence thereon should be reversed without remand, because the evidence as a matter of law failed to establish his guilt of that offense.

Voluntary manslaughter is defined in section 9—2(b) (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(b) as follows:

> "A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable."

The pertinent provisions of "Article 7 of this Code" (Ill. Rev. Stat. 1985, ch. 38, par. 7—1) state:

> "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself ***."

With regard to whether the evidence established beyond a reasonable doubt that the defendant intended to kill Harriet Price, and there

is an adequate basis in the record before us for a convincing argument that it does not, the trial court did not make an expressed specific finding that it did, although such a finding of intent to kill is implicit in the trial court finding the defendant guilty of voluntary manslaughter. In finding the defendant guilty of voluntary manslaughter, the trial court stated:

> "The court has considered the evidence received in the course of this trial and the arguments of counsel. And there is no question but that the—from the evidence, the defendant is responsible for the death of the victim in this case. *The court is dubious concerning the defendant's version how it all came about. But the evidence as it stands embraces the possibility that it occurred as the defendant claims or somewhat in that manner.* There had been a relationship between the parties. Under this factual situation, the court having in mind the appellate court's view of a situation of this kind, the court finds the defendant guilty of the lesser included offense of voluntary manslaughter." (Emphasis added.)

The trial court did not amplify or explain its dubiousness *"concerning the defendant's version how it all came about."* The trial court did, however, conclude that *"the evidence as it stands embraces the possibility that it occurred as the defendant claims* or somewhat in that manner." (Emphasis added.) The defendant's statement was that Price vilified him and without provocation attacked him with a butcher knife, while stating to him that she was going to kill him, and that in defending himself he grabbed her by the neck and choked her, that she went limp and he released her and discovered that she was dead. Under the aforesaid provision of section 7—1, the defendant was justified in the use of force to defend himself against Price's imminent use of unlawful force against him with a butcher knife to kill him.

Contrary to the majority's assertion, the trial court made no finding, as does the majority, *sua sponte*, that "the defendant's belief that he had to use deadly force was unreasonable." I do not agree with the trial court or the majority's belated speculation, pursued in a peaceful, calm and serene courtroom atmosphere and contrary to the defendant's split-second decision made under an unprovoked attack with a butcher knife, defaming remarks and expressions of intent to kill him, "that defendant used more force than was necessary for his own self-defense where he was over one foot taller and 27 pounds heavier than the victim and exerted such force that he fractured a neck bone when he strangled her to death." 170 Ill. App. 3d at 112.

First, it can be just as persuasively and logically conversely con-

cluded that the amount of force the defendant used in fracturing the victim's neck bone demonstrates how frightened the defendant was for his life because of the attack and the amount of force he believed that was necessary to defend himself against it. Second, the evidence does not establish the extent of Price's pugilistic skills or reputation. Third, the evidence fails to establish the extent to which the defendant feared Price. Fourth, the evidence does not establish how or the method that Price attacked the defendant with the butcher knife, the size of the butcher knife, or her skills in using it in an attack. The burden was not on the defendant to prove that his belief was reasonable, rather, the burden was on the State to prove beyond a reasonable doubt that the defendant's belief that the force he used to defend himself was unreasonable. The State failed in satisfying this burden. The majority has conjectured virtually out of whole cloth its conclusion that the defendant's belief that the force he used to defend himself against imminent death or great bodily harm was unreasonable. The evidence does not prove the defendant's guilt of voluntary manslaughter beyond a reasonable doubt. (*People v. Harling* (1975), 29 Ill. App. 3d 1053, 331 N.E.2d 653; *People v. Morgan* (1969), 114 Ill. App. 2d 421, 252 N.E.2d 730; *People v. Honey* (1966), 69 Ill. App. 2d 429, 217 N.E.2d 371.) His conviction should therefore be reversed.